**FASOLINO FOODS CO., INC., Plaintiff,**

v.

**BANCA NAZIONALE DEL LAVORO, Defendant.**

**BANCA NAZIONALE DEL LAVORO, Third–Party Plaintiff,**

v.

**Antonio FASOLINO, Third–Party Defendant.**

**No. 90 Civ. 334 (JMC).**

United States District Court, S.D. New York.

March 20, 1991.

J. Joseph Bainton, Clifford James, Shea & Gould, New York City, for plaintiff and third-party defendant.

Melvin A. Brusterman, Barry Sabin, Strook & Strook & Lavan, New York City, for defendant and third-party plaintiff.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

After a bench trial on plaintiff's claims, the Court finds in favor of defendant/third-party plaintiff.

## BACKGROUND

This bifurcated action was tried by the Court without a jury. Having heard and carefully considered all the evidence in this matter, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

(1) Plaintiff Fasolino Foods Company, Inc. ["Fasolino Foods"] is a New Jersey corporation engaged in the business of importing and distributing food products from Italy.

(2) Defendant and third-party plaintiff Banca Nazionale del Lavoro ["BNL" or the "Bank"] is a foreign corporation organized and existing under the laws of Italy and does business in the State of New York. BNL is a commercial bank licensed to engage in all types of banking.

(3) Third-party defendant Antonio Fasolino ["Fasolino"] is the president and sole shareholder of Fasolino Foods and a resident of the State of New Jersey.

*The Establishment of a Banking Relationship with BNL*

(4) In November or December 1988, Fasolino met with Francesco Ingargiola, an account officer at BNL, and Stephano Felicori, the head of the commercial credit department at BNL, to establish a credit facility for his importing business.

(5) Fasolino next met with Ingargiola and Felicori on January 9, 1989 to discuss Fasolino's request for a $4 million credit facility that would be used by Fasolino Foods to purchase goods from Italy for delivery in the United States to a wholly-owned subsidiary of Kraft, Inc. ["Kraft"].

(6) Fasolino proposed that the requested $4 million line of credit would be secured by a $4 million "back up" letter of credit issued for the benefit of BNL by a suitable bank acting on behalf of Kraft, the intended purchaser.

(7) At the January 9 meeting, Ingargiola and Felicori informed Fasolino that additional financial information from Fasolino and Fasolino Foods was needed in order to determine the propriety of a $4 million line of credit.

(8) At the January 9 meeting, there were no discussions between the parties concerning a $5 million credit facility related to non-Kraft business.

(9) Thomas DeLuca, in-house counsel to Fasolino Foods, sent a letter to Ingargiola on January 9, 1989 confirming Fasolino's meeting earlier in the day with Ingargiola and Felicori. With respect to the proposed $4 million credit facility for Fasolino Foods' importation of olive oil from Italy for distribution to Kraft, DeLuca states, "We have structured the transaction to be risk free for all parties, especially the bank." Defendant's Trial Exhibit ["Dx"] A, at 1.

(10) On January 14, 1989, Fasolino telecopied to BNL the requested financial information, including his personal guaranty, Fasolino Foods' corporate financial infor-

mation and Fasolino Foods' corporate resolution.

(11) The financial statements of Fasolino Foods received by BNL were unaudited and, therefore, BNL requested that Fasolino attest to the accuracy of the financial information. As part of its investigation, BNL also ordered a Dun & Bradstreet report reflecting the estimated financial strength of Fasolino Foods.

(12) Upon receipt of Fasolino Foods' letter of credit agreement and Fasolino's personal guaranty, BNL notified Fasolino that the Bank would extend Fasolino Foods a credit facility for the opening of letters of credit in connection with the Kraft transaction if certain conditions were satisfied. *See* Dx H, I. As revised, the conditions included (i) that the Kraft back up letter of credit comply with BNL's lending guidelines, (ii) that BNL receive a copy of the sale contract between Fasolino Foods and Kraft and (iii) that BNL's New York branch Credit Committee approve the credit proposal. *See* Dx H.

(13) Defendant's exhibits H and I do not constitute a formal commitment by BNL to extend a credit facility to Fasolino Foods. Rather, the letters indicate that the Bank would undertake such a facility if the conditions listed therein were satisfied.

*The Letter of Credit Agreement*

(14) On January 14, 1989, Fasolino executed and delivered to BNL, on behalf of Fasolino Foods, a Letter of Credit Agreement [the "LOC Agreement"].

(15) The LOC Agreement sets forth the terms and conditions that govern all applications by Fasolino Foods to BNL for letters of credit and all letters of credit issued by BNL to Fasolino Foods.

(16) Section 4 of the LOC Agreement defines an event of default to include, among other things, failure by Fasolino Foods to perform any of its obligations to BNL under the terms of the LOC Agreement and default by Fasolino Foods under any evidence of indebtedness issued, assumed or guaranteed by Fasolino Foods. Upon any event of default by Fasolino Foods, all of Fasolino Foods' obligations

"shall become due and payable without presentment, demand, protest or other notice of any kind, all of which we [Fasolino Foods] hereby expressly waive." Dx O.

*The Guaranty Agreement*

(17) On January 14, Fasolino also executed and delivered to BNL a personal guaranty agreement [the "Guaranty"].

(18) Pursuant to the Guaranty, Fasolino guaranteed to BNL "the payment of any and all such bills, notes, checks, drafts and other debts or liabilities either made, endorsed, or contracted by [Fasolino Foods]...." Dx F.

(19) In addition, under the Guaranty Fasolino agreed to pay "cost of protest and all expenses (including reasonable attorney's fees) of or for collection or for realization upon any underlying collateral or upon this guaranty." *Id.*

*BNL Credit Facility Procedures*

(20) BNL's New York branch Credit Committee had authority to extend credit facilities for the issuance of letters of credit up to a maximum amount of $1 million.

(21) BNL's Regional Credit Committee for the New York geographical area had authority to extend credit facilities for the issuance of letters of credit in excess of $1 million but less than $5 million.

(22) BNL's international headquarters in Rome, Italy had sole authority to extend credit facilities for the issuance of letters of credit in excess of $5 million.

(23) The New York branch Credit Committee consisted of the branch manager, Carlo Vecchi, and the head of the commercial division, Felicori.

(24) Claudio Ciampi was the vice president of the BNL New York branch.

(25) Thomas Badolato was the manager of BNL's letter of credit department. As such, he was responsible for the technical or mechanical aspects in the issuance of letters of credit. However, contrary to Fasolino's testimony, Badolato had no authority to approve applications for letters of credit or credit facilities.

*The Approved Credit Facility*

(26) Within one week after receiving Fasolino Foods' financial statements, BNL representatives informed Fasolino that a $1 million credit line for Fasolino Foods would be recommended to the New York branch Credit Committee.

(27) Ingargiola informed Fasolino that a $4 million line of credit was not warranted given the structure of the Kraft deal.

(28) Ingargiola and Felicori recommended to the New York branch Credit Committee approval of a $1 million credit facility to be used for the issuance of letters of credit for Kraft business on behalf of Fasolino Foods.

(29) On March 3, 1989, the Credit Committee approved the recommended $1 million Kraft credit facility for the benefit of Fasolino Foods. The credit facility provided that BNL would extend credit to Fasolino Foods if the goods being imported are bound for Kraft and there is a standby letter of credit from Kraft's bank in favor of BNL.

(30) All credit facilities approved by the BNL New York branch Credit Committee are recorded in the Libro Fidi which is maintained by BNL pursuant to Italian law. Its purpose is not to represent all details of a particular credit facility, but rather to broadly describe the chronological business proceedings of the Bank.

(31) The $1 million credit facility approved by BNL on behalf of Fasolino Foods was recorded in the Libro Fidi. The entry specified that the credit facility would be backed by a letter of credit in the amount of $4 million issued by Kraft's bank.

(32) Ingargiola telephoned Fasolino during the second week of March to inform him that Fasolino Foods had been granted a $1 million credit facility by the New York branch Credit Committee. No BNL representative sent Fasolino written confirmation of the approved $1 million credit facility.

(33) Neither Ingargiola nor any other BNL representative ever requested that the New York branch Credit Committee approve a $4 million credit facility for Kraft business for the benefit of Fasolino Foods or a $5 million credit facility for non-Kraft business for the benefit of Fasolino Foods.

(34) Neither Ingargiola nor any other BNL representative ever informed Fasolino that a $4 million credit facility for Kraft business for the benefit of Fasolino Foods had been submitted to or approved by the New York branch Credit Committee.

(35) Neither Ingargiola nor any other BNL representative ever informed Fasolino that a $5 million credit facility for general or non-Kraft business for the benefit of Fasolino Foods had been submitted to or approved by the New York branch Credit Committee.

(36) All internal records of BNL uniformly reflect a credit facility to be used for the issuance of letters of credit on behalf of Fasolino Foods in the amount of $1 million.

(37) No documents received by BNL indicate approval of a credit facility on behalf of Fasolino Foods in an amount other than $1 million.

(38) Fasolino's reliance upon defendant's exhibits E, Z and AA to establish a $4 million Kraft line of credit and a $5 million non-Kraft line of credit is grossly misplaced.

(39) Defendant's exhibits E, Z and AA—the only documents to even mention a general or non-Kraft credit facility extended by BNL to Fasolino Foods—were produced by Fasolino Foods after initial document production had taken place. Fasolino's testimony that defendant's exhibits E, Z and AA were in his home safe and that he was in Italy when most of Fasolino Foods' documents were produced to BNL is at odds with the credible evidence relating to these documents.

(40) Defendant's exhibit AA purports to be a letter from Fasolino to Ingargiola dated February 20, 1989 confirming BNL's commitment to provide Fasolino Foods with a $4,279,000 Kraft line of credit and that it will take an additional two to four weeks to obtain BNL's commitment on the general

line of credit. The document reflects that carbon copies were sent to Felicori and Badolato. The document also bears Federal Express invoice number 2574483800, the identical number set forth on defendant's exhibit WW. Attached to defendant's exhibit AA is a sender's copy of the same Federal Express invoice that is annexed to defendant's exhibit WW.

Defendant's exhibit WW is a letter from Fasolino to Badolato dated February 22, 1989. The letter makes reference only to the enclosed letter of credit application. Attached to defendant's exhibit WW is a recipient's copy of the Federal Express invoice bearing the same invoice number as set forth on the correspondence (invoice no. 2574483800). When read in conjunction with defendant's exhibit VV, it is evident that defendant's exhibit WW containing the letter of credit application was sent via Federal Express from Fasolino Foods to BNL on February 22, 1989 and received by BNL the next day.

Contrary to Fasolino's testimony, defendant's exhibit AA was not included in the Federal Express package with defendant's exhibit WW. Rather, in order to create the appearance of receipt by BNL, Fasolino attached a Federal Express invoice that had actually been sent to Badolato and set forth that Federal Express invoice number on the letter. The authenticity of defendant's exhibit AA is clearly suspect. First, the letter is addressed to Ingargiola while the Federal Express invoice names Badolato as the recipient. Second, and most significantly, the document is dated February 20, 1989 while the Federal Express invoice is dated February 22, 1989.

(41) Defendant's exhibit E purports to be a letter dated January 14, 1989 from Fasolino to Felicori, with a carbon copy to Ingargiola. Defendant's exhibit E confirms that BNL had agreed to issue to Fasolino Foods a $4.5 million credit facility for Kraft business and a $4 million credit facility for non-Kraft business. Fasolino testified that the document was typed by his secretary from his office on Saturday, January 14.

Defendant's exhibit D is also a letter dated January 14, 1989 from Fasolino to Felicori enclosing certain financial information requested by BNL. This letter, however, was typed by Fasolino's wife and telecopied to BNL from Fasolino's home. In addition, Fasolino sent an identical set of these materials via Federal Express. Both the faxed and federal expressed materials were received by BNL on Tuesday, January 17, Monday being a bank holiday.

At times, Fasolino requested that his wife and clerical staff work on Saturdays. Thus, the mere fact that defendant's exhibit E reflects a date which was a Saturday is not dispositive of the document's authenticity. However, it is undisputed that defendant's exhibit D was typed by Fasolino's wife on Saturday and faxed from Fasolino's home, with receipt by BNL on the following Tuesday. The document, however, fails to make reference to defendant's exhibit E. Fasolino failed to explain why one letter was typed by his wife and mailed from his home while the other letter was typed by his secretary and mailed from his office. The circumstances surrounding the transmission of these documents suggests that defendant's exhibit E is not an authentic document.

(42) Defendant's exhibit Z purports to be a letter from Fasolino to Felicori dated March 7, 1989. Although defendant's exhibit Z was written after Fasolino had purportedly received approval of the $4 million Kraft credit facility, the document confusingly states that BNL combined the two lines of credit into a $5 million general purpose credit facility.

(43) Ingargiola, Felicori and Badolato all testified that they did not receive defendant's exhibits E, Z and AA. Ingargiola, Felicori and Badolato further testified that prior to the commencement of the instant action they had never seen defendant's exhibits E, Z and AA. No copy of defendant's exhibits E, Z or AA reflects a receipt stamp by BNL. Moreover, despite a search of BNL's files, no copy of defendant's exhibits E, Z or AA was found.

(44) The testimonial and documentary evidence point to the inescapable conclusion that defendant's exhibits E, Z and AA are fictitious documents belatedly created by

Fasolino or on behalf of Fasolino to support the existence of two lines of credit issued by BNL to Fasolino Foods—a $4 million Kraft credit facility and a $5 million non-Kraft credit facility.

(45) Fasolino's contention that Ingargiola purged defendant's exhibits E, Z and AA from BNL's files in late October or early November 1989 after receiving the Vecchi memorandum is utterly absurd. Although Ingargiola was aware that the Atlanta branch manager was fired for improper banking practices relating to letters of credit, there is not a shred of credible evidence suggesting that Ingargiola destroyed defendant's exhibits E, Z and AA in order to save his job.

(46) On October 25, 1989, Vecchi delivered to all lending officers a memorandum he had written involving failure to follow BNL rules and procedures for certain accounts, including the account of Fasolino Foods. Vecchi was concerned with situations in which lending officers (i) exceeded a line of credit, (ii) extended credit without a line of credit in place or (iii) extended credit without satisfaction of the conditions precedent set forth in the line of credit. Vecchi warned in his memorandum that these improper practices by lending officers might expose BNL to lender liability claims. Vecchi's reference to lender liability claims stemmed from his concern that an unscrupulous customer might take advantage of BNL by twisting the situation into an unintended result. Vecchi was not concerned with possible harm by BNL to its customers.

*Failure to Satisfy Conditions of the Credit Facility*

(47) Fasolino sent Badolato a *draft* standby letter of credit on February 10, 1989 to be opened at Kraft's bank in favor of BNL. The credible evidence belies Fasolino's testimony that Badolato approved the draft standby letter of credit. Neither Badolato nor any other BNL representative ever informed Fasolino that the draft letter of credit was satisfactory to BNL. Although the draft letter of credit was in favor of BNL as originally contemplated by the parties, Badolato testified that numerous problems existed with respect to the protection afforded to BNL by the draft letter of credit, including but not limited to the need for BNL to present invoices issued by Fasolino Foods in order to obtain payment under the proposed letter of credit. Based on Badolato's review, Ingargiola informed Fasolino that BNL had rejected the draft letter of credit.

(48) Fasolino subsequently provided BNL with a restructured letter of credit from Bank America International ["Bank America"] in the spring of 1990.

(49) Fasolino Foods failed to comply with the unambiguous conditions imposed by BNL for extending the $1 million credit facility. The credit facility approved by the New York branch Credit Committee on March 3, 1989 required Kraft to open a standby letter of credit in favor of BNL for credit to the account of Fasolino Foods, thereby protecting the Bank from any risk if Fasolino Foods did not pay. The Bank America letter of credit, however, was drawn in favor of and for the benefit of Fasolino Foods, not BNL. Thus, the letter of credit primarily protected Fasolino Foods against nonpayment from Kraft. Admittedly, BNL did not inform Bank America or Fasolino Foods in writing that the standby letter of credit did not comply with the form contemplated by the approved $1 million credit facility. However, both prior to and during the October 2, 1989 meeting at BNL, BNL representatives orally informed Fasolino that the Bank America letter of credit was not satisfactory because it failed to provide the necessary protection for BNL.

Accordingly, while BNL approved the Kraft credit facility on March 3, 1989, Fasolino Foods failed to satisfy the conditions imposed by BNL for extending the $1 million credit facility.

(50) During 1989, BNL issued letters of credit on behalf of Fasolino Foods in an aggregate amount of $1,827,320.09.

(51) Each letter of credit application submitted by Fasolino Foods to BNL during 1989 was unrelated to Kraft business and failed to include a standby letter of credit as security to BNL. Despite this noncom-

pliance with the approved $1 million credit facility, BNL representatives decided to issue the letters of credit pursuant to the approved credit facility relating to Kraft business. BNL officers believed it was prudent to be flexible with the exposure in Fasolino Foods' approved credit facility for the following reasons: (i) payment was being received from Fasolino Foods, albeit in an untimely manner, (ii) the banking relationship offered BNL the opportunity to establish a business relationship with Kraft and (iii) BNL was protected by Fasolino's personal guaranty. None of the letters of credit were issued by BNL pursuant to a $5 million credit facility for non-Kraft business, as the credible evidence indicates that BNL did not extend a general purpose credit facility to Fasolino Foods.

*The Overdraft Sheets*

(52) BNL generated overdraft sheets on a daily basis during the regular course of its business. Overdraft sheets reflect the BNL customer checking accounts that exceeded the line of credit facility.

(53) It was the regular practice at BNL for the account officer and the head of the commercial line to review the overdraft sheets on a daily basis. The account officer and head of the commercial line signified their review and approval of the account by signing or initialing the overdraft sheets.

(54) During the course of BNL's banking relationship with Fasolino Foods, Ingargiola, Felicori and Ciampi reviewed and initialed the overdraft sheets for the Fasolino Foods account.

(55) When a customer has a credit facility to obtain letters of credit to be issued by BNL and there is no overdraft line of credit in place, it is the custom and practice of BNL to receive payment from the customer on the maturity date of the letter of credit or a day or two thereafter.

(56) Although certain customers on the overdraft sheets had an overdraft line of credit, at no time did Fasolino Foods have an overdraft line of credit with BNL. Rather, Fasolino Foods' credit facility required that it make payment or have sufficient funds in its checking account with BNL to cover all amounts upon maturity of letters of credit.

(57) Fasolino Foods failed to remit payment to BNL or have sufficient funds in its checking account with BNL to cover the maturity of letters of credit issued pursuant to its credit facility.

(58) Fasolino testified that after the "Atlanta problem" arose in August of 1989, BNL for the first time requested that Fasolino Foods forward payment to the Bank upon maturity of letters of credit. This testimony, however, starkly contradicts the credible evidence presented at trial.

The Atlanta problem involved alleged improper banking practices relating to letters of credit issued by the BNL branch in Atlanta, Georgia. However, the Atlanta problem was not the reason why BNL requested payment from Fasolino Foods upon maturity. As early as June 1989—well before the Atlanta problem arose—BNL representatives first telephoned and wrote to Fasolino requesting that Fasolino Foods remit payment to cover its overdraft situation. While the Atlanta problem may have motivated BNL representatives to keep abreast of all overdraft situations at the New York branch, in the context of the instant dispute it is simply irrelevant. The overwhelming quantum of evidence demonstrates that Fasolino did not have an overdraft line of credit and, accordingly, was asked repeatedly to remit payment to the Bank to cover its overdraft situation.

(59) In every instance after BNL demanded payment from Fasolino Foods to cover its overdraft, BNL received such payment. However, on the average, Fasolino Foods paid thirty-six days after maturity of the letter of credit.

(60) Despite such untimely payments by Fasolino Foods, in the summer of 1989 BNL officers made a business decision to continue to issue letters of credit in favor of Fasolino Foods.

*The Additional Letters of Credit*

(61) On October 25, 1989, Fasolino Foods applied pursuant to its purported $5 million general credit facility for two letters of credit to be issued on its behalf by BNL—

one in favor of Sant' Andrea S.r.L. ["Sant' Andrea"] in the amount of $234,720 and one in favor of Oleificio Borelli S.p.A. ["Borelli"] in the amount of $105,187.50 [the "additional letters of credit"].

(62) On November 1, 1989, Fasolino requested that the letter of credit in favor of Sant' Andrea be increased from $234,720 to $469,440. At the top of the November 1 letter, Ciampi placed his initials in a box marked "approved." Ciampi's notation was part of BNL's internal processing of the letter of credit application.

(63) On November 15, 1989, Fasolino sent Ingargiola a letter indicating that the letter of credit in favor of Borelli would be increased and reiterating that the letter of credit in favor of Sant' Andrea should be in the amount of $469,440. At the top of the letter, Ingargiola wrote the words "O.K. L/C Dept" followed by his initials. Based on the credible evidence presented at trial, Ingargiola's notation on the document does not indicate his approval of the issuance of the additional letters of credit. Rather, the notation signifies that Ingargiola read the document and sent it to the letter of credit department.

(64) On November 16, 1989, Fasolino requested that the letter of credit in favor of Borelli be increased to $169,917.

(65) Fasolino Foods was in an overdraft situation when it requested the additional letters of credit.

(66) On November 30, 1989, DeLuca wrote to BNL threatening litigation by Fasolino Foods unless the Bank promptly issued the additional letters of credit on behalf of Fasolino Foods in accordance with the "$4 million credit facility" extended by BNL. DeLuca annexed the salient correspondence between the parties to support his contention that BNL had extended a single credit facility to Fasolino Foods in the amount of $4 million. Significantly, not a single document annexed to the November 30 letter makes reference to a non-Kraft or general credit facility extended by BNL for the benefit of Fasolino Foods. Moreover, the documentation that Fasolino claims establishes the existence of a $5 million non-Kraft credit facility—defen-

dant's exhibits E, Z and AA—were not annexed to the November 30 letter. Fasolino's testimony that DeLuca was "incompetent" in sending the November 30 letter without first asking him for defendant's exhibits E, Z and AA is simply a futile attempt by Fasolino to establish the authenticity of these documents. *See* Trial Transcript, at 380–81. Fasolino testified that DeLuca was aware of the details of the $5 million non-Kraft credit facility from the time it was extended by BNL in February or March of 1989. Therefore, if in fact a general credit facility existed and DeLuca was aware of it, as in-house counsel to Fasolino Foods he surely would have mentioned it in his November 30 letter requesting the issuance of additional letters of credit unrelated to the Kraft credit facility.

(67) No BNL officer ever approved or represented to Fasolino Foods that BNL approved the issuance of the additional letters of credit. Rather, BNL advised Fasolino Foods that it would consider issuing the additional letters of credit if Fasolino Foods remitted payment to decrease its credit exposure and provided BNL with additional security in the form of a standby letter of credit acceptable to BNL. Fasolino Foods did not satisfy these requirements and, accordingly, on December 7, 1989, BNL informed Fasolino Foods that it would not issue the additional letters of credit.

(68) As a result of BNL's decision not to issue the additional letters of credit, Fasolino Foods stopped making payments to BNL to cover matured letters of credit and commissions accrued in connection with the issuance of those letters of credit. Thereafter, Fasolino Foods commenced the instant action against BNL on January 22, 1990.

(69) Pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, the parties agreed to try only the issue of BNL's liability to Fasolino Foods. The amount of damages of Fasolino Foods, if any, will abide the event.

Defendant BNL's counterclaim against plaintiff Fasolino Foods seeks recovery for matured letters of credit issued for the

account of Fasolino Foods and commissions and charges related to the issuance of those letters of credit. Third-party plaintiff BNL seeks recovery from third-party defendant Fasolino as payment guarantor of the obligations of Fasolino Foods to BNL. Fasolino Foods admits liability to BNL for damages sustained by BNL on its counterclaim. Third-party defendant Fasolino also admits liability to third-party plaintiff BNL on its third-party claim. Fasolino Foods and Fasolino have stipulated that the amount of damages for which they are jointly and severally liable to BNL is $1,289,579.93 plus interest from March, 30, 1990 through the date of payment at the prime rate charged by BNL plus two percent. In addition, Fasolino has stipulated that pursuant to his Guaranty he is liable to BNL for its reasonable attorneys' fees incurred in connection with this action and all reasonable expenses for collection. Fasolino Foods and Fasolino dispute their liability to BNL only to the extent that Fasolino Foods claims it is entitled to set-off its indebtedness to BNL against the greater damages caused by BNL for which it seeks recovery in the instant action.

## CONCLUSIONS OF LAW

(1) Plaintiff's request that the Court strike certain statements in defendant's post-trial memorandum of law as impertinent and scandalous matter is denied. *See* Fed.R.Civ.P. 12(f).

■ (2) At trial, Fasolino Foods submitted ninety-six requests for the Court to take judicial notice of newspaper articles discussing the Atlanta problem. Rule 201(b) of the Federal Rules of Evidence provides that a judicially noticed adjudicative fact must not be subject to reasonable dispute in that it is "capable of accurate and ready determination by result to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). The rule is not designed to expand the use of judicial notice, but rather continues "the tradition ... of caution in requiring that the matter be beyond reasonable controversy." Fed.R.Evid. 201(b) advisory committee's note.

The Court denies plaintiff's ninety-six requests for judicial notice since the credible testimony of Vecchi, Ciampi and Felicori adequately establishes that in August of 1989 the BNL Atlanta branch was embroiled in a major controversy involving its lending practices. Given this evidence, judicial notice is simply not warranted. Indeed, the advisory committee's notes recognize that "taking evidence, subject to cross-examination and rebuttal, is the best way to resolve controversies involving disputes of adjudicative facts, that is, facts pertaining to the parties." Fed.R.Evid. 201(b) advisory committee's note.

■ (3) Pursuant to Fasolino Foods' request, the Court takes judicial notice of Dun & Bradstreet's financial ratings. The definition of Dun & Bradstreet's financial ratings is a matter beyond reasonable dispute. *See* Fed.R.Evid. 201(b).

(4) It is a fundamental principle of banking law that the establishment of a line of credit does not mean that a bank has to lend to the full extent of the credit facility. As one leading commentator has observed:

> A "line of credit" is a limit of credit to cover a series of transactions. A line of credit does not impart upon [a] bank a legal responsibility to loan up to the limit or a responsibility on the lender to borrow up to the limit, but merely facilitates the easier extension of credit; therefore, if information later comes to light which reflects upon a borrower's ability to satisfy its debts, a bank need not fund the entire line of credit.

5B *Michie on Banks and Banking* § 301, at 249–50 (1983) (footnotes omitted).

(5) Principles of contract formation dictate that a binding contractual obligation must be 'sufficiently definite and explicit in order to be enforceable. There is no enforceable contract if the parties have failed to agree on all of the essential terms or if some of the terms supplied by the parties are too indefinite to be enforceable. *See Durante Bros. & Sons v. Flushing Nat'l Bank,* 755 F.2d 239, 252 (2d Cir.), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985); *Interocean Shipping*

*Co. v. National Shipping & Trading Corp.,* 462 F.2d 673, 676 (2d Cir.1972). Thus, " 'if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract.' " *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 588 (2d Cir.1987) (quoting *Candid Prods., Inc. v. International Skating Union,* 530 F.Supp. 1330, 1333–34 (S.D.N.Y.1982)).

■ (6) Based on the credibility of the witnesses and the weight of the evidence adduced at trial, there was no meeting of the minds between the parties to establish the existence of a $5 million credit facility for the issuance of letters of credit unrelated to Kraft business for the benefit of Fasolino Foods. Therefore, BNL's decision not to issue the additional letters of credit does not constitute a breach of the $5 million non-Kraft credit facility.[1]

■ (7) Ciampi's notation on the November 1 letter and Ingargiola's notation on the November 15 letter standing alone do not constitute a definite agreement to issue the additional letters of credit. Since BNL did not enter into a separate contractual relationship with Fasolino Foods regarding the additional letters of credit, BNL's decision not to issue those letters of credit does not constitute a breach of contract.

(8) Under New York law, in every contract " 'there exists an implied covenant of good faith and fair dealing.' " *Gordon v. Nationwide Mut. Ins. Co.,* 30 N.Y.2d 427, 437, 285 N.E.2d 849, 854, 334 N.Y.S.2d 601, 608 (1972) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933)), *cert. denied,* 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973).

(9) Fasolino Foods' reliance on *K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752 (6th Cir.1985) to establish that BNL's failure to issue the additional letters of credit consti-

tutes a breach the implied covenant of good faith is misplaced.

Under the lending agreement in *K.M.C.,* Irving Trust Company ["Irving"] agreed to extend to K.M.C. a line of credit not to exceed $3.5 million in exchange for a security interest in all of K.M.C.'s accounts receivable and inventory. *See id.* at 754. The lending agreement also required K.M.C. to deposit all of its receipts into a "blocked account" to which Irving had sole access. *See id.* at 759. After K.M.C. drew $2.7 million under the agreement during a three year period, K.M.C. sought an additional $800,000 advance. *See id.* at 754. Without giving prior notice to K.M.C., Irving refused to advance the additional requested funds. *See id.*

The Sixth Circuit, applying New York law, recognized that a lender who enters into a line of credit agreement has an implied obligation of good faith to give notice to its borrower before refusing an extension of credit under the agreement, unless the refusal without notice was made in good faith on the determination that the borrower's financial condition would not warrant such a loan. *See id.* at 759. The court placed significant emphasis on the fact that K.M.C. agreed to the extraordinary "blocked account" method of securing payment—depositing all its accounts receivable into a bank account over which Irving had exclusive control. Irving's failure to advance funds would leave K.M.C. without any operating capital unless it could secure alternative financing. Thus, the "blocked account" mechanism left "K.M.C.'s continued existence entirely at the whim or mercy of Irving, absent an obligation of good faith performance." *Id.* Accordingly, the Sixth Circuit found Irving liable for failing to give adequate notice that the loan would not be made.

■ (10) There must be an enforceable loan agreement between the parties to give rise to the *K.M.C.* notice rule. *See In re*

---

1. Insofar as there was no $5 million non-Kraft agreement, the Court need not consider BNL's alternative argument that even if such an agreement existed, BNL was excused from perform-ance because Fasolino Foods' defaulted on its obligation to pay BNL on the maturity dates of the issued letters of credit.

*Red Cedar Constr. Co.*, 63 B.R. 228, 237–38 (W.D.Mich.Bankr.1986); *Gilbert Cent. Corp. v. Overland Nat'l Bank*, 232 Neb. 778, 442 N.W.2d 372, 377 (1989). In *K.M.C.*, Irving clearly issued a line of credit to the borrower. In the instant case, however, there is no credible evidence that BNL ever committed to the loan sued upon—the two additional letter of credit applications. There is no line of credit agreement between the parties for the issuance of letters of credit unrelated to Kraft business. In addition, there is no independent contract between the parties for the issuance of the two additional letters of credit.

The fact that BNL in the past approved letter of credit applications unrelated to Kraft business does not give rise to an implied contract that may serve as the predicate for the *K.M.C.* notice rule. A prior course of dealings between the parties is a tool for interpreting existing contracts and may not be used to establish contract formation. *See Thiele v. Security State Bank*, 396 N.W.2d 295, 300–01 (N.D. 1986); *Schaller v. Marine Nat'l Bank*, 131 Wis.2d 389, 388 N.W.2d 645, 650 (Ct.App. 1986); *see also Restatement (Second) of Contracts* § 223 (1981). Thus, as a matter of law, BNL's previous courtesy of issuing letters of credit unrelated to Kraft business and thus not in material conformity with the approved line of credit does not create an obligation to do so at all times absent a contract or promissory estoppel.[2]

(11) The instant situation is analogous to a bank's decision not to honor a customer's overdraft even though it had previously honored such overdrafts or notified the customer prior to dishonor. By honoring an overdraft, the bank makes an unsecured loan to its customer due on demand. *See Schaller*, 388 N.W.2d at 684. However, "[b]ecause a bank often lets good customers overdraw, the latter do not thereby acquire the right to do so when the bank deems it improper to permit it." 5B *Michie on Banks and Banking* § 303, at

252–53 (1983). In the absence of an express agreement to the contrary or promissory estoppel, a bank's previous practice of honoring overdrafts or giving notice prior to dishonor does not create an obligation to follow such practices in every future situation. *See Thiele*, 396 N.W.2d at 301; *Schaller*, 388 N.W.2d at 649–50. Despite any prior course of dealings between the parties, a bank retains discretion to honor or dishonor a check that creates an overdraft. In exercising its discretion, a bank makes a business decision that typically turns on factors such as the size of the overdraft and the bank's opinion of its customer. *See* J. White & R. Summers, *Uniform Commercial Code* § 18–3, at 768–69 (3d ed. 1988).

(12) Even assuming the existence of a line of credit to Fasolino Foods that would cover the two letter of credit applications sued upon, there is a significant factual distinction which precludes application of the *K.M.C.* notice rule. In *K.M.C.*, the "blocked account" method of securing payment placed K.M.C. at the bank's mercy. Consequently, K.M.C. had no means of self-protection in the absence of notice from the lender to allow for an opportunity to seek alternate financing. In contrast, Fasolino Foods did not utilize a "blocked account" mechanism which placed it at the "mercy and whim" of BNL. In fact, Fasolino Foods sought additional credit facilities and mortgages from a different lending institution both prior to and subsequent to BNL's decision not to issue the additional letters of credit. Thus, unlike *K.M.C.*, BNL's decision not to issue the two additional letters of credit on behalf of Fasolino Foods was not an "abrupt refusal to advance funds ... [which] amounted to a unilateral decision on [its] part to wind up the company." *K.M.C.*, 757 F.2d at 763. The obligation of good faith implied in a line of credit agreement cannot be expanded to impose a duty on the lender to give notice before refusing to advance funds where the borrower is not at the lender's

**2.** Fasolino Foods does not allege that the prior course of conduct between the parties gives rise to promissory estoppel.

mercy and can reasonably avoid any potential loss. *See Shaughnessy v. Mark Twain State Bank,* 715 S.W.2d 944, 953 (Mo.Ct. App.1986) (declining to apply *K.M.C.* notice rule where borrower was not at bank's mercy); *Schaller,* 388 N.W.2d at 651 (same).

■■ (13) Fasolino Foods' claim that BNL breached its obligation of good faith and observance of general banking usage under New York Uniform Commercial Code ["U.C.C."] section 5–109 is misplaced.[3] The official comment to U.C.C. section 5–109 illustrates that the lender's obligation of good faith and observance of trade usage is wholly dependent upon the existence of an agreement between the parties. The official comment provides in pertinent part as follows:

> The extent of the issuer's obligation to its customer is based upon the agreement between the two. Like all agreements within the Code, that agreement is the bargain of the parties in fact as defined in Section 1–201(3) and includes the obligation of good faith imposed by Section 1–203 and the observance of any course of dealing or usage of trade made applicable by Section 1–205.

N.Y. U.C.C. § 5–109 official comment 1 (McKinney 1991). Plaintiff's verified complaint indicates that its U.C.C. claim is premised upon the $5 million non-Kraft agreement. *See* Verified Complaint, at ¶ 26. However, given the absence of a $5 million non-Kraft agreement between the parties, the obligations contained in U.C.C. section 5–109 are not applicable.

(14) Fasolino Foods failed to prove by clear and convincing evidence that BNL fraudulently misrepresented to Fasolino Foods its intention to honor the $5 million agreement and to issue the additional letters of credit. *See Brown v. Lockwood,* 76

A.D.2d 721, 730, 432 N.Y.S.2d 186, 193 (2d Dep't 1980).

(15) Fasolino Foods failed to prove by a fair preponderance of the credible evidence that BNL negligently misrepresented to Fasolino Foods its intention to honor the $5 million agreement and to issue the additional letters of credit.

### CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court finds in favor of defendant on each claim asserted by plaintiff. Plaintiff Fasolino Foods and third-party defendant Fasolino are jointly and severally liable to defendant/third-party plaintiff BNL in the stipulated amount of $1,289,579.93 plus interest from March 30, 1990 through the date of payment at the prime rate charged by BNL plus two percent. Fasolino Foods is not entitled to a set-off of its liability.

Pursuant to the terms of the Guaranty, third-party defendant Fasolino is also liable to BNL for its reasonable attorneys' fees incurred in connection with this action and all reasonable expenses for collection. BNL shall submit a detailed affidavit setting forth its reasonable attorneys' fees within twenty (20) days of the filing of this Memorandum and Order. Fasolino shall submit its objections, if any, within ten (10) days after receipt of the affidavit.

The Clerk of the Court is directed to enter judgment for defendant/third-party plaintiff BNL and to dismiss the complaint.

SO ORDERED.

---

**3.** U.C.C. section 5–109(1) provides as follows: (1) An issuer's obligation to its customer includes good faith and observance of any general banking usage but unless otherwise agreed does not include liability or responsibility

(a) for performance of the underlying contract for sale or other transaction between the customer and the beneficiary; or

(b) for any act or omission of any person other than itself or its own branch or for loss or destruction of a draft, demand or document in transit or in the possession of others; or

(c) based on knowledge or lack of knowledge of any usage of any particular trade. N.Y. U.C.C. § 5–109(1) (McKinney 1991).