**FASOLINO FOODS CO., INC.,**
**Plaintiff–Appellant,**

v.

**BANCA NAZIONALE DEL LAVORO,**
**Defendant–Appellee.**

**BANCA NAZIONALE DEL LAVORO,**
**Third–Party Plaintiff–Appellee,**

v.

**Antonio R. FASOLINO, Third–**
**Party Defendant–Appellant.**

**No. 458, Docket 91–7560.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 12, 1991.

Decided April 13, 1992.

Before: LUMBARD, NEWMAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Plaintiff-appellant Fasolino Foods Co., Inc. ("Appellant" or "FFC") and third-party defendant-appellant Antonio R. Fasolino ("Appellant" or "Fasolino") appeal from an adverse decision after a bench trial before Judge Cannella. 761 F.Supp. 1010. FFC and Fasolino sought damages resulting from alleged breaches by Banca Nazionale del Lavoro ("BNL") of a commitment to provide certain financing and of implied duties of good faith and fair dealing. We affirm.

## BACKGROUND

FFC is a New Jersey corporation that imports and distributes food products from Italy. Fasolino, a resident of New Jersey, is FFC's president and sole shareholder. BNL is a banking corporation, owned by the government of Italy, which does business in New York.

In late 1988, Fasolino met with Francesco Ingargiola, a BNL account officer, and Stephano Felicori, the head of BNL's commercial credit department, to discuss FFC's request for a $4 million line of credit to finance its importing of products from Italy for Anderson Clayton/Humko Products, Inc., a wholly-owned subsidiary of Kraft, Inc. We style this line of credit the "Kraft line of credit." A second request for a line of credit to finance FFC's non-Kraft business also appears to have been discussed at various times. We style this line of credit the "general line of credit."

Ingargiola and Felicori sought financial information concerning FFC and a personal guaranty of all loans by Fasolino. The financial statements provided were unaudited, and BNL requested that Fasolino sign them to attest to their accuracy, which he did. Fasolino also executed the guaranty. A standing letter of credit agreement ("LOC Agreement") was signed by Fasolino on FFC's behalf and delivered to BNL on January 14, 1989. The LOC Agreement

Maurice N. Ross, Shea & Gould, New York City for plaintiff-appellant and third-party defendant-appellant.

Melvin A. Brosterman, Stroock & Stroock & Lavan, New York City, for defendant-appellee.

contained terms and conditions applicable to all letters of credit—whether under the Kraft or general lines of credit—issued by BNL to FFC. Section 4 of the LOC Agreement, titled "Acceleration in Event of Default," stated that FFC would be considered in default if it failed to perform any obligation to BNL. The LOC Agreement further stated that in the event of default, obligations "shall become due and payable without presentment, demand, protest or other notice of any other kind, all of which we [FFC] hereby expressly waive." Section 6 of the LOC Agreement stated that "Failure to exercise and/or delay in exercising on your [BNL's] part, any right, power or privilege hereunder ... shall not constitute a waiver thereof."

Judge Cannella found that, after BNL's Regional Credit Committee received the LOC Agreement, it recommended that the New York branch Credit Committee approve a $1 million Kraft line of credit. The reduction of the amount from $4 million appears due to the structure of the Kraft transaction, which, in BNL's view, would never involve more than $1 million in outstanding credit if the required payments were timely made. The New York branch Credit Committee approved the $1 million Kraft line of credit on March 3, 1989. This approval was conditioned upon the requirement that the Kraft line of credit be secured by a standby letter of credit issued for the benefit of BNL by a suitable bank acting on Kraft's behalf. Ingargiola telephoned Fasolino to notify him of the approval in the second week of March. Appellants claim on appeal that a $4 million Kraft line of credit was approved. Judge Cannella's findings are not clearly erroneous for reasons stated *infra*.

Whatever its parameters, the Kraft line of credit appears never to have been used. The credit was limited to the financing of goods imported by FFC for Kraft, but it appears that no such goods were ever imported. Moreover, Kraft never opened a standby letter of credit in BNL's name, as BNL had required as a condition to the opening of the Kraft line of credit. A letter of credit was established but only in favor of FFC, not BNL. The standby letter of credit, therefore, did not protect BNL.

However, FFC also claims that BNL made an oral commitment to open a $5 million general line of credit for non-Kraft business. Judge Cannella found that no such commitment was made. As discussed *infra*, that finding is not clearly erroneous.

Nevertheless, BNL did issue letters of credit to finance FFC's non-Kraft business. These letters of credit were governed by the LOC Agreement, which required that FFC remit payment in full upon maturity or have sufficient funds in its checking account with BNL to cover amounts due. FFC was rarely in compliance with these conditions and was routinely in an overdraft situation notwithstanding the lack of an overdraft line of credit with BNL. FFC's payments were on average thirty-six days late through the summer of 1989. Despite these late payments, BNL issued over twenty letters of credit in part on the fact that although payment was not timely, the money was ultimately received. Moreover, the credit relationship with FFC was perceived as offering BNL an opportunity to begin a business relationship with Kraft. Finally, the debt was personally guaranteed by Fasolino.

On October 25, 1989, FFC applied for two more letters of credit—one for $234,720.00 and one for $105,187.50. BNL began processing these requests, and, when the applications were introduced as exhibits at trial, they contained notations by BNL officers that FFC contends were indications of final approval. However, Judge Cannella found that the notations reflected only that the particular officers had either simply read the application or given at best preliminary approval. Meanwhile, FFC significantly increased the amounts requested. As of November 17, the additional letters of credit requested by FFC were for $169,917.00 and $469,440.00 or a total of $639,357.00. The largest previous request for a letter of credit had been in the amount of $211,075.00, and the new requests, if approved, would have substantially increased FFC's outstanding debt to BNL. Moreover, FFC was at this time in

its usual overdraft situation. On November 17, BNL officers advised FFC that approval of the additional letters of credit would be conditioned on BNL receiving adequate security to minimize its risk, specifically, a standby letter of credit in BNL's name. They also demanded payment of the overdraft amounts.

On November 30, house counsel for FFC threatened litigation against BNL if the bank did not comply with an alleged commitment to a "$4 million" line of credit. Attached to his letter was correspondence said to establish the existence of the "$4 million" line of credit. FFC failed to provide BNL with additional security in connection with this request and, therefore, on December 7, 1989, BNL informed FFC that the additional letters of credit would not be approved. FFC then stopped payments to BNL due on matured letters of credit, along with payments for commissions it owed BNL.

On January 19, 1990, FFC brought the instant action against BNL. FFC claimed that BNL breached its contractual commitment to a $5 million general line of credit, that it violated its duty of good faith and fair dealing in its banking relationship with FFC, and that it made negligent and/or fraudulent misrepresentations to FFC regarding its intention to provide a $5 million general line of credit. BNL counterclaimed, seeking recovery for matured letters of credit and various related commissions and charges. BNL also sought to recover from Fasolino as guarantor of FFC's liabilities. Appellants did not contest their liability to BNL and stipulated to the amount of damages.

On March 20, 1991, following a five-day bench trial, Judge Cannella found against FFC on each of its claims and for BNL on its counterclaim. FFC and Fasolino were held jointly and severally liable for the stipulated sum of $1,289,579.93, and for interest from March 30, 1990 in the stipulated amount of $164,665.74. The district court also ordered payment of attorney's

fees to BNL in the amount of $197,284.35. FFC and Fasolino appealed.

## DISCUSSION

Appellants argue that it was clearly erroneous for the district court not to have found, based on Fasolino's and a third-party witness's testimony and three pieces of correspondence, that BNL agreed to provide a $4 million Kraft line of credit and a $5 million general line of credit. We disagree.

In bench trials, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. R.Civ.P. 52(a). In *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), the Supreme Court reemphasized that a reviewing court should not examine findings of fact *de novo:* "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse...." *Id.* at 573–74, 105 S.Ct. at 1511. With regard to credibility determinations, the Court stated that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." 470 U.S. at 575, 105 S.Ct. at 1512.

Judge Cannella found that the only line of credit approved by BNL was the $1 million Kraft line of credit. Judge Cannella disbelieved Fasolino's testimony regarding a $4 million Kraft line of credit and a $5 million general line of credit, and in this case we will not disturb findings that are based on the district court's credibility determinations. The documents proffered by Fasolino in support of his claim of a $4 million Kraft line of credit and a $5 million line of credit consisted of three letters to BNL allegedly written by him.[1] Judge

---

1. The continued argument over the size of the approved Kraft line of credit is puzzling in light of its seeming irrelevance. The argument may continue because the three letters refer to the $4 million Kraft line of credit, and, if Judge Cannella's finding of only a $1 million Kraft line of credit stands, the letters might be discredited in their entirety on that ground alone.

Cannella determined that all three were fabrications created after the fact for purposes of this litigation. There is substantial evidence to support his finding. For example, none of the letters were found in BNL's files, and the only evidence of their having been mailed was Fasolino's discredited testimony. Moreover, none of the letters were produced by FFC in the initial document exchange although they were supposedly in Fasolino's possession and were the only documents supportive of his claim at trial. One letter bore the same Federal Express invoice number as another letter (with a different date) that was received by BNL, and Judge Cannella reasonably found that the two letters were not mailed together. Another letter not received by BNL was purportedly typed by Fasolino's secretary on the same day that his wife typed and mailed a letter that was received by BNL. The latter did not mention the former. Finally, when counsel for FFC set out in a letter FFC's understanding of BNL's commitments based on attached documents, the correspondence in question was not attached, although at trial it was central to appellants' evidentiary proffer. Judge Cannella's finding of fabrication was, therefore, not clearly erroneous.

The strongest evidence supporting the claim of a larger line of credit was testimony by a disinterested third party that Ingargiola had told him that FFC had a "medium 7 figure"—$4 million to $5 million— unsecured letter of credit. However, the district court was not obliged as a matter of law to credit this evidence and ignore the evidence to the contrary. The possibility of errors in communication cannot be excluded, particularly where the Kraft line of credit was intended to finance $4 million of business but was limited to $1 million of credit outstanding at any time.

We therefore uphold the district court's determination that appellants failed to prove an express agreement to provide FFC with a $4 million Kraft line of credit and $5 million general line of credit.[2]

There was thus no express obligation on BNL's part to approve any letters of credit on non-Kraft business.

■ This determination disposes of appellants' argument that BNL breached a duty of good faith and fair dealing, implied by its alleged express contractual relationship with FFC, by not approving the additional letters of credit. Under New York law, parties to an express contract are bound by an implied duty of good faith, "but breach of that duty is merely a breach of the underlying contract." *Geler v. National Westminster Bank USA,* 770 F.Supp. 210, 215 (S.D.N.Y.1991) (citations omitted). Moreover, New York Uniform Commercial Code § 5–109 provides: "An issuer's obligation to its customer includes good faith and observance of any general banking usage...." *See also* N.Y.U.C.C.Law § 1–203 (duty of good faith applies to enforcement and performance of contracts). However, the Official Comment to Section 5–109 states: "The extent of the issuer's obligation to its customer is based upon the agreement between the two." N.Y.U.C.C. Official Comment 1 (McKinney 1991).

■ Given Judge Cannella's findings, the only express agreements before us are the $1 million Kraft line of credit and the LOC Agreement. The applications in question were for non-Kraft business, and whatever obligations to act in good faith the Kraft line of credit might have implied are not relevant. The LOC Agreement arguably embodies a duty of good faith with regard to existing letters of credit, but no justifiable inference can be drawn from its terms obligating BNL to apply any particular standards in evaluating applications for further credit. BNL thus did not violate any duty of good faith implied from the express contracts before us.

■ Appellants' express contract claim also founders on their failure to comply with the LOC Agreement. FFC's overdrafts were defaults entitling BNL not only to decline further extensions of credit

---

2. Because Judge Cannella found that no such representations were made by BNL, appellants'

claims based on negligent misrepresentation and fraud must be rejected.

but also to accelerate the payment of existing debt. Even if BNL were committed to a $5 million general line of credit, it was still entitled to timely payment and, once overdrafts occurred, to decline further extensions of credit and accelerate payments or to insist on the lesser measure of requiring greater security.

As Judge Posner has recently written: "[E]ven after you have signed a contract, you are not obliged to become an altruist toward the other party and relax the terms if he gets into trouble in performing his side of the bargain." *Market Street Assocs. Ltd. Partnership v. Frey*, 941 F.2d 588, 594 (7th Cir.1991) (citing *Kham & Nates's Shoes No. 2. Inc. v. First Bank*, 908 F.2d 1351, 1357 (7th Cir.1990)). When FFC applied for the letters of credit in issue, it was in violation of the LOC Agreement and in default. It was, therefore, not in a position to demand as a matter of right BNL's extension of further credit, even if an agreement as to a $5 million general line of credit existed.

We also read appellants to advance an implied contract argument based on the parties' course of dealing in which BNL approved numerous applications by FFC for letters of credit, usually in overdraft situations. This implied agreement is itself said to entail an obligation to act in good faith and to require BNL to approve the applications at issue, at least in the absence of sufficient advance notice. The argument is unsupported by New York case law, the U.C.C., or common sense.

■ BNL's prior approval of FFC's applications for letters of credit in overdraft situations hardly implies a continuing obligation to issue future such letters, much less an obligation to increase the amount of credit extended. What obligation BNL might have had if FFC had made timely payments is not before us. However, a rule that banks may not issue letters of credit to a defaulting borrower without obligating themselves to issue yet more letters in the future would help the borrower in this case but would work to the detriment of future borrowers. Such a rule would disable banks from ending risky financing relationships and cutting their losses, causing the banks either to charge greater interest to compensate for the greater risk or to be more selective in initiating financing relationships, or both. Indeed, Section 6 of the LOC Agreement states that BNL does not waive its rights by non-enforcement. We see no reason not to give that provision its plain meaning. Indeed, a contrary view would discourage lenders from allowing borrowers leeway and encourage those lenders to play hardball in the face of every default, no matter how minor. Furthermore, even if the payments had been timely, an obligation on BNL's part to increase the outstanding debt cannot be implied. Such an obligation would require BNL to extend credit that had been requested but never agreed to.

■ Appellants also argue that the obligation to act in good faith resulting from the implied agreement based on the parties' course of dealing bound BNL to give FFC notice of disapproval sufficient to allow it to obtain alternative financing. In making this argument, appellants rely principally upon *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985). In *K.M.C.*, Irving Trust had entered into an agreement with K.M.C. to extend a line of credit not to exceed $3.5 million. The agreement required K.M.C. to deposit all receipts into a blocked account, to which only Irving Trust had access. After K.M.C. withdrew $2.7 million according to the terms of the agreement, K.M.C. sought to withdraw the remaining $800,000. At that point and without any advance notice, Irving Trust refused to release the funds to K.M.C., leading to the latter's demise. The Sixth Circuit ruled that under the line of credit agreement, Irving Trust was under a good faith obligation to give notice to K.M.C. that it would not advance more funds sufficient to allow K.M.C. to obtain other financing.

We do not pause to address the validity of the K.M.C. analysis because the decision is easily distinguishable. First, *K.M.C.* involved an agreed-upon line of credit of $3.5 million. In the instant matter, the only express agreement for a line of credit was

the Kraft $1 million line of credit, and the applications in question were for non-Kraft business. Unlike the parties in *K.M.C.*, therefore, BNL never represented that credit of a certain amount would be provided, and FFC had no reasonable expectation of continued, much less expanded, credit in overdraft situations.

> Second, *K.M.C.* involved a 'blocked account' mechanism [that] would leave K.M.C.'s continued existence entirely at the whim or mercy of Irving, absent an obligation of good faith performance. Logically, at such time as Irving might wish to curtail financing K.M.C., as was its right under the agreement, this obligation to act in good faith would require a period of notice to K.M.C. to allow it a reasonable opportunity to seek alternate financing.

*Id.* at 759. In *K.M.C.*, therefore, the court viewed the blocked account as a barrier to K.M.C.'s obtaining credit elsewhere and apparently contemplated, as part of the required notice, a release of the blocked funds to the extent they exceeded the outstanding debt. In the instant matter, BNL controlled none of FFC's assets, and BNL could not impede FFC's seeking credit elsewhere. Indeed, FFC had notice in mid-November that BNL wanted the overdraft situation redressed and more security provided before issuing letters of credit that would increase FFC's outstanding debt to BNL. FFC was at that time completely free to seek credit elsewhere.

Finally, appellants also ask us to remand for a new trial on the entirely meritless ground that "the District Court's wholly conclusory disposition of FFC's claims" did not comply with Fed.R.Civ.P. 52(a). Rule 52(a) states, in relevant part: "In all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon." Fed.R.Civ.P. 52(a). The district court clearly fulfilled this obligation in nineteen pages of lucid factual findings and another ten pages of well-supported legal conclusions. All that is required by Rule 52(a) is that the trial court provide findings that are adequate to allow a clear understanding of its ruling. *See Fluor Corp. v. United States ex rel. Mosher Steel Co.*, 405 F.2d 823, 828 (9th Cir.), *cert. denied*, 394 U.S. 1014, 89 S.Ct. 1632, 23 L.Ed.2d 40 (1969); *see also Squirt-Co v. Seven–Up Co.*, 628 F.2d 1086 (8th Cir.1980) (failure to find facts specially is ground for vacatur and remand where facts are disputed). Judge Cannella's thorough opinion easily met that test.

Affirmed.