**L.G. DEFELICE, INC.**

v.

**FIREMAN'S INSURANCE CO. and Continental Casualty Co.**

**No. 3:97 CV 18(PCD).**

United States District Court, D. Connecticut.

Sept. 21, 1998.

Raymond A. Garcia, William S. Wilson, II, Garcia & Milas, New Haven, CT, for Plaintiff.

David A. Haught, Louis B. Blumenfeld, Cooney, Scully & Dowling, Hartford, CT, Gary M. Elden, Pamela A. Bitsas, Lynn H. Murray, Grippo & Elden, Chicago, IL, for Defendants.

*RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT*

DORSEY, Senior District Judge.

On December 9, 1996, plaintiff L.G. Defelice, Inc. ["Defelice"], a road construction company, commenced an action in state court against CNA Financial Corporation ["CNA"], and Fireman's Insurance Company ["Fireman's"], a CNA-owned surety company that was to provide Defelice with a bid bond for a reconstruction project along 1–95 in Bridgeport. The case was removed to federal court on January 3, 1997. (Dkt.# 1). On March 24,1997, CNA was dismissed as a party to the suit. (Dkt:# 6–1). The plaintiff amended the complaint on April 9, adding Continental Casualty Company ["CCC"], the principal processing entity for CNA's surety companies, as a defendant. (Dkt.# 8). Count One of the amended complaint alleges that the defendants breached a contract with Defelice to provide a bid bond that complied with the regulations set forth by the Connecticut Department of Transportation ["ConnDOT"]. Count Two alleges that the plaintiff sustained damages caused by the defendants' negligence in failing to comply with the standard of care in the surety industry. Count Three alleges that defendants engaged in unfair and deceptive acts that violated the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42–110a, *et seq.* ["CUTPA"].

On February 21, 1998, defendants filed a motion for summary judgment as to all counts,[1] a Local Rule 9(c) Statement of Undisputed Facts ["Defendants' State-

---

1. Seventeen exhibits were attached to defendants' motion (Dkt.# 43): copy of the amended complaint (Exh. 1); excerpts from the deposition of Sebastian Cianci, taken on July 2,

ment"], and a memorandum of law in support of its motion. (Dkt.# # 43–45). Two days later, plaintiff filed a Motion for Partial Summary Judgment, a memorandum of law in support of its motion, Local Rule 9(c) Statement of Undisputed Facts ["Plaintiffs Statement"], and various attachments to its motion.[2] (Dkt.# # 46–49). On April 8, 1998, Defelice filed its memorandum in opposition to defendants' motion for summary judgment, a statement of material facts as to which a genuine issue exists to be tried, and various attachments to its memorandum. (Dkt.# # 53–4, 57).[3] On the same day, defendants filed a Response to Plaintiff's Local Rule 9(c) Statement of Undisputed Material Facts and its own Statement of Undisputed Material Facts, as well as a Response to Plaintiff's Motion for Partial Summary Judgment ["Defendant's Response"].[4] (Dkt.# 55–6). On April 23, 1998, defendants filed a reply to the plaintiff's response to its motion of summary

1997 ["Cianci Dep."] (Exh. 2); excerpts from ConnDOT Standard Specifications Book 814A (Exh. 3); copy of Yellow Mill Project Bid Announcement (Exh. 4); copy of ConnDOT's notice announcing change in T-limit requirements, dated March 13, 1996 ["ConnDOT T-limit notice"] (Exh. 5); excerpts from the deposition of Richard Guyette, taken on September 25,1997 ["Guyette Dep."] (Exh. 6); excerpts from the deposition of Robert Campbell, taken on May 14, 1997 [First Campbell Dep.] (Exh. 7); copy of letter from William McGee to ConnDOT, dated June 5, 1996 (Exh. 8); copy of bond request form sent by Defelice to Campbell, dated April 15,1996 (Exh. 9); letters to ConnDOT from CNA and R. Bradley Wolfe, dated May 21, 1996 and June 13, 1996, respectively ["CNA letters"] (Exh. 10); copy of the results of bidding and rebidding for the Yellow Mill Project (Exh. 11); copy of letters from ConnDOT to William McGee, dated June 4, 1996 and June 17, 1997, respectively (Exh. 12, 14); copy of an unpublished decision, *A. Laugeni & Son v. State of Connecticut, Dept. of Transportation*, No. CV–95–0705641S, 1995 WL 441666 (Conn.Super. July 12, 1995) (Exh. 13); copy of affidavit of L. Lee Schumacher (Exh. 15); copy of Defelice's damage analysis report, dated September 3, 1997 (Exh. 16); and excerpts from deposition of William McGee, dated October 17,1997 ["McGee Dep."] (Exh. 17).

**2.** Twenty-three exhibits were attached to plaintiffs motion and memorandum (Dkt.# 49): excerpts from the First Campbell Dep. (Exhs. A, D, G, K, L, O, P, Q, and R); excerpts from the deposition of Campbell as an individual, taken on December 17,1997 ["Second Campbell Dep."] (Exhs. B, C, H, I, and T); excerpts from the deposition of Victor Hallberg, taken on September 11, 1997 ["Hallberg Dep."] (Exh. E); copy of defendants' Responses to Plaintiff's First Set of Interrogatories, ¶¶ 11 and 12, and copy of defendants' Supplemental Response to Plaintiff's First Set of Interrogatories, ¶ 11 (Exh. J); excerpts from the Cianci deposition (Exhs.M, X); excerpts from the deposition of Ernest

Susanin, taken on February 13,1998 ["Susanin Dep."] (Exh. S); excerpts from the deposition of Kathleen Flanagan, taken on December 19, 1997 ["Flanagan Dep."] (Exh. U); affidavit of William McGee with exhibit, dated February 23, 1998 (Exh. V); and copy of *Laugeni* decision (Exh. X).

**3.** Fifteen exhibits were attached to plaintiff's memorandum: excerpt from deposition of Robert Campbell, taken on December 17, 1997, and copy of bond request form sent by Defelice to Campbell, dated April 15, 1996 (Exh. A); excerpt from the McGee Dep. (Exh. B); excerpt from first Campbell deposition, and copy of bid bond provided by Campbell for Defelice for Yellow Mill 1, dated May 15, 1996 (Exh. C); excerpt from Hallberg Dep. (Exh. D); copy of defendants' Responses to Plaintiff's First Set of Interrogatories, ¶¶ 11 and 12, and copy of defendants' Supplemental Response to Plaintiff's First Set of Interrogatories, ¶ 11 (Exh. E); excerpt from Cianci Dep., ConnDOT letters to Defelice, dated May 16, 1996 and June 4, 1996 respectively, and copy of ConnDOT T-limit notice (Exh. F); excerpt from Guyette Dep. (Exh. G); copy of *Laugeni* decision (Exh. H); excerpt of Susanin Dep. (Exh. J); affidavit of L. Lee Schumacher ["Schumacher Aff."] (Exh. K); excerpts from deposition of L. Lee Schumacher, taken December 11, 1997 ["Schumacher Dep."] (Exh. L); PinnacleOne expert report, dated October 24, 1997 (Exh. M); excerpts from deposition of Kenneth E. Fargnoli (Exh. N); Lanny Harer expert report, dated September 3,1997 ["Harer Report"] (Exh. O); and copy of plaintiff's Memorandum in Support of its Motion for Summary Judgment (Exh. P).

**4.** Twenty-eight exhibits were attached to defendants' response (Dkt.# 56): excerpt from First Campbell Dep. (Exh. 1); excerpt from Second Campbell Dep. (Exh. 2); excerpt from Cianci Dep. (Exh. 3); copy of a letter to ConnDOT from Defelice, dated June 5, 1996

judgment,[5] (Dkt.# 58); plaintiff filed a reply and various attachments to defendants' response to its own motion for summary judgment.[6] (Dkt.# # 59–60). For the reasons stated below, defendants' motion for summary judgment, (Dkt.# 43), is *denied* and plaintiff's cross-motion for partial summary judgment, (Dkt.# 46), is *denied*.

## I. FACTUAL BACKGROUND

The following facts are apparently undisputed.[7] Defelice is a road construction company that previously worked for Conn-DOT. (Plaintiff's Statement ¶ 1; Defendant's Response at 1). When it assembled bids for the State, Defelice often used CNA's Vice–President/Surety Manager Robert Campbell ["Campbell"] to prepare its bid bonds.[8] (Plaintiff's Statement ¶ 4; Defendant's Statement at 5, 8). Campbell has been employed by several insurance companies throughout the twenty-five year time period during which he performed this service. (Plaintiff's Statement ¶¶ 5, 7;

and two letters to ConnDOT from CNA, dated May 21, 1996 and June 13, 1996 (Exh. 4); copy of bulletin from the Connecticut Construction Industries Association (Exh. 5); excerpt from Susanin Dep. (Exh. 6); excerpt from deposition of Stephen Grant, taken on January 12, 1998 ["Grant Dep."] (Exh. 7); excerpt from deposition of Richard Saul, taken on January 12,1998 ["Saul Dep."] (Exh. 8); ConnDOT T-limit notice (Exh. 9); excerpt from Guyette Dep. (Exh. 10); excerpt from McGee Dep. (Exh. 11); excerpt from deposition of Bette Sampsel, taken on January 15, 1998 ["Sampsel Dep."] (Exh. 12); excerpt from deposition of Michelle Orlando, taken on December 9,1997 ["Orlando Dep."] (Exh. 13); excerpt from deposition of Kevin McCabe, taken on December 5, 1997 ["McCabe Dep."] (Exh. 14); copy of letter from Flanagan to Defelice, dated February 5, 1997 (Exh. 15); copy of letter from ConnDOT to William McGee, dated June 17,1997 (Exh. 16); excerpt from deposition of Richard Ferrucci, taken on January 7, 1998 ["Ferrucci Dep."] (Exh. 17); excerpt from deposition of Anthony J. Romano, taken on January 7, 1998 ["Romano Dep."] (Exh. 18); copy of bid bond request form sent by Defelice to Campbell, dated April 15, 1996 (Exh. 19); copy of indemnification agreement between Defelice and CNA, dated February 14, 1992 (Exh. 20); copy of ConnDOT letter to Defelice rejecting its Yellow Mill 1 bid, dated June 4, 1996 (Exh. 21); excerpts from ConnDOT Standard Specifications Book 814A (Exh. 22); copy of Conn-DOT notice of the Yellow Mill 1 project (Exh. 23); copy of Schumacher affidavit (Exh. 24); copy of Harer Report (Exh. 25); copy of the results of bidding and rebidding for the Yellow Mill Project (Exh. 26); excerpt from Flanagan Dep. (Exh. 27); and copies of relevant cases (Exh. 28).

5. Eleven exhibits were attached to defendants' reply (Dkt.# 58): excerpt from McGee Dep. (Exh. 1); excerpt from Hallberg Dep. (Exh. 2); excerpt from First Campbell Dep. (Exh. 3); excerpt from Second Campbell Dep.

(Exh. 4); copy of affidavit of Campbell (Exh. 5); copies of relevant cases (Exh. 6); excerpt from Cianci Dep. (Exh. 7); excerpt from Guyette Dep. (Exh. 8); excerpt from deposition of Gary Giulietti, dated November 20, 1997 (Exh. 9); excerpt from Susanin Dep. (Exh. 10); and copy of Schumacher Aft. (Exh. 11).

6. Sixteen exhibits were attached to plaintiff's reply (Dkt.# 60): excerpt from Second Campbell Dep. (Exh. 1); excerpt from Cianci Dep. (Exh. 2); excerpt from Saul Dep. (Exh. 3); excerpt from Grant Dep. (Exh. 4); excerpt from Sampsel Dep. (Exh. 5); excerpt from McCabe Dep. (Exh. 6); excerpt from Orlando Dep. (Exh. 7); excerpt from Ferrucci Dep., taken January 7, 1998 (Exh. 8); excerpt from Romano Dep., taken January 7, 1998 (Exh. 9); copy of Gary Giulietti expert report, dated October 2, 1997 (Exh. 10); excerpt from deposition of Kevin Spellacy, taken January 5, 1998 (Exh. 11); excerpt from deposition of Russell Canterbury, taken January 12, 1998 (Exh. 12); excerpt from deposition of Pall Oushana, taken January 14,1998 (Exh. 13); excerpt from deposition of Richard Rab, taken December 1, 1997 (Exh. 14); copy of *Villano v. Pomeroy*, No. 380018, 1998 WL 47798 (Conn.Super. February 2, 1998); 4 Conn. Ops. 272, 273 (March 2, 1998) (Exh. 15); and excerpt from deposition of Greg Laugeni, taken December 22,1998 (Exh. 16).

7. Local Rule 9(c)1 provides that "[a]ll material facts set forth in [the moving party's] statement will be deemed to be admitted unless controverted by the statement required to be served by the opposing party in accordance with rule 9(c)2."

8. A bid bond is a form of insurance whereby an obligor (a surety company) agrees to be liable to an obligee (in this case, ConnDOT) for a certain percentage of a total bid submitted by a principal (a contractor) if that principal is the low bidder but fails to enter into a

Defendant's Response at 5, 8). Currently, he is employed by CCC, the principle processor for all the surety companies owned by CNA. (Plaintiff's Statement ¶¶ 2–3; Defendant's Statement ¶ 4).

On March 13, 1996, ConnDOT advertised for bids on a project to reconstruct a portion of I–95 spanning the Yellow Mill Channel in Bridgeport ["Yellow Mill 1"]. (Plaintiff's Statement ¶ 3; Defendant's Statement ¶ 1). On March 21, 1996, Defelice contacted Campbell to request that he prepare a bid bond for Yellow Mill 1 and it sent him information on the project. (Plaintiff's Statement ¶ 3; Defendant's Statement ¶ 2). Campbell assembled a bid bond issued by Fireman's, one of the surety companies owned by CNA and processed through CCC. (Plaintiff's Statement ¶ 14; Defendant's Statement ¶ 6). He used Ernest Susanin, owner of a local insurance broker, the E.S. Susanin Agency ["Susanin"], as the agent of record for the Defelice account, an arrangement which earned Susanin a small commission from CNA. (Plaintiff's Statement ¶ 30; Defendant's Response, Statement ¶¶ 30, 31). On May 15, 1996, Defelice submitted its bid together with the bid bond that Campbell prepared. (Plaintiff's Statement ¶ 16; Defendant's Response at 19).[9] For a bid to be considered by ConnDOT, it must comply with the Department's regulations and requirements specific to individual projects. (Plaintiff's Statement ¶ 17; Defendant's Statement ¶ 12). Although Defelice's bid was the lowest submitted, ConnDOT rejected it as nonresponsive because its bid bond did not comply with its standards. (Plaintiff's Statement 120; Defendant's Statement ¶ 17).

ConnDOT's requirements are set forth in its Standard Specifications for Roads, Bridges and Incidental Construction, Form 814A, section 1.02.07 (1995) ["Standard Specifications Book"].

Except when otherwise specified in the bid documents, no proposal will be considered unless ... it is accompanied by a proposal guaranty in the form of a bond from a surety company [a bid bond], satisfactory to the Commissioner, in an amount equal to at least ⅛ of the amount of the bid. . . .

At the time of the bid opening, the surety must be a corporate surety licensed by the Insurance Commissioner of the State of Connecticut and must hold a Certificate of Authority as an acceptable Surety ... acceptable to the Federal Department of Treasury. *The surety's underwriting limitation must not be less than the full amount required by the bond, itself.*

(emphasis added)(plaintiff's Statement ¶ 21; Defendant's Statement ¶¶ 7–8). A surety's underwriting limitation, established by the U.S. Department of Treasury, is known as its "T-limit."[10] (*Id.*). While ConnDOT maintains that this policy was in place for over a year before Defelice's bid was rejected, it first put the T-limit requirement in writing on March 13, 1996, when it mailed a notice to construction companies stating that the policy was to be effective for projects advertised on May 1, 1996 or later. (Plaintiff's Statement ¶ 22; Defendant's Statement ¶¶ 18–20; Defendant's Response at 12–13). Campbell did not check the T-limit of Fireman's or any other one of CNA's companies before issuing the bid bond. (Plaintiff's Statement 1 27; Defendant's Response at 27).

After Defelice objected to the grounds on which its bid was rejected, ConnDOT re-advertised the Yellow Mill Channel pro-

contract with the obligee for the amount of the bid.

9. At this time, there was an indemnification agreement in place between Defelice and Fireman's. (Plaintiff's Statement ¶ 34; Defendant's Response at 30–31).

10. This T-limit requirement is established by federal regulations which provide that no company shall write any bond or policy to an interested party "the amount of which is greater than 10 percent of the paid up capital and surplus of such company." 31 C.F.R. § 223.10 (1996).

ject ["Yellow Mill 2"] and conducted an entirely new bidding round. (Plaintiff's Statement ¶ 25; Defendant's Statement ¶ 22). After this round, Defelice's bid was no longer the lowest and as a result, the company was not awarded the contract. (Plaintiff's Statement ¶ 25; Defendant's Statement ¶ 29).

## II. DISCUSSION

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party meets this burden, the adverse party must then affirmatively set forth specific facts which demonstrate that a genuine issue for trial exists. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine and precludes summary judgment when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. In evaluating whether a genuine issue of material fact exists, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Id.* at 255, 106 S.Ct. 2505.

To survive a motion for summary judgment, a nonmoving party alleging the existence of a contract has the burden of presenting evidence that the other party agreed to some form of contractual commitment. *Coelho v. Posi–Seal Int'l, Inc.*, 208 Conn. 106, 111–12, 544 A.2d 170 (1988); ambiguous contractual terms are to be construed in favor of the nonmoving party. *Bouzo v. Citibank, N.A.*, 96 F.3d 51, 58 (2d Cir.1996). Moreover, summary judgment only is appropriate when the language of

the contract is unambiguous. *Id.* In the absence of definitive contractual language, the parties' intentions as to the scope of their contractual commitments is an inference of fact best left to the jury. *Coelho*, at 113, 544 A.2d 170.

Defendants seek summary judgment as to all claims set forth in plaintiff's complaint. Plaintiff in its cross-motion seeks summary judgment as to the first claim.

### A. COUNT ONE

In Count One, plaintiff alleges that a contract existed whereby defendants prepared bid bonds for Defelice in exchange for Defelice's continued business. (Dkt.# 8, ¶¶ 4, 19). Defendants argue that no such contract existed because no meeting of the minds indicated that defendants bore this responsibility. (Dkt. # 45, at 1, 8.)

Plaintiff also claims that the terms of the alleged contract between itself and defendants indicate that it was Campbell's duty to assure that the bid bonds he provided Defelice complied with current ConnDOT regulations. (Dkt.# 8, ¶¶ 4, 19). By failing to issue a Yellow Mill I bid bond that met these requirements, defendants allegedly breached their express and implied duties under the contractual agreement. (*Id.* ¶ 18). Defendants contend that even if a contract between the parties were to be found, it did not stipulate that it was Campbell's responsibility to assure that the bid bonds he issued were valid. (*Id.*). In addition, defendants claim that plaintiffs are incorrect to assert that defendants' alleged failure to provide a valid Yellow Mill 1 bid bond breached a duty of care implied in the contract. (Dkt. # 56, at 10–12). They argue that such a claim is actionable not in contract but in tort. (*Id.*).

### 1. Formation

The threshold issue is whether there was a contract between Defelice and the defendants whereby Campbell agreed to

provide Defelice with valid bid bonds for the Yellow Mill 1 project. A contract is formed when there is an offer and acceptance based on a mutual understanding between the parties. *Steinberg v. Reding,* 24 Conn.App. 212, 214, 587 A.2d 170, 172 (1991). This understanding must be manifested in mutual assent between the parties. *Ubysz v. DiPietro,* 185 Conn. 47, 51, 440 A.2d 830 (1981). In this case, no written document indicates that such an understanding ever existed. (Dkt. # 53, at 17). Plaintiff instead claims that this agreement is evidenced by the existence of an oral or implied contract. (Dkt. # 47, at 11; Dkt. # 53, at 15–16; Dkt. # 59, at 4).[11]

### a. Oral Contract

■ Defelice contends that conversations that its presidents and chief estimators had with Campbell throughout the past twenty-five years gave rise to an oral contract whereby Campbell was "to provide bid bonds for bids such as the one for [Yellow Mill 1]." (Dkt. # 8, ¶ 18; Dkt. # 53, at 15–16). Defendant agues that express representations to this effect never occurred. (Dkt. # 45, at 8).

11. In its complaint, plaintiff also alludes to an estoppel claim, arguing that Campbell's statements were designed to induce reliance on the part of Defelice. (Dkt.# 8, ¶¶ 9–10). Only later in its Motion for Partial Summary Judgment does plaintiff first allege that Campbell owed Defelice a duty based on promissory estoppel. (Dkt. # 47, at 24, 26–7; Dkt. # 53, at 21).

> It is well established that any recovery premised on estoppel must be supported by proof of two essential elements: (1) the party against whom estoppel is claimed must be shown to have done or said something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and (2) the other party must be shown to have changed its position in reliance on those facts, thereby incurring some injury.
> *Herbert S. Newman & Partners, P.C. v. CFC Constr. Ltd. Partnership,* 236 Conn. 750, 768, 674 A.2d 1313, 1323 (1996). "[A] fundamental element of promissory estoppel ... is the existence of a clear and definite promise

■ A promise may be stated in words either oral or written. RESTATEMENT (SECOND) OF CONTRACTS § 4. The threshold question with regards to the existence of an oral contract is not what intention existed in the minds of the parties but what intentions were expressed in the language used. *Bria v. St. Joseph's Hosp.,* 153 Conn. 626, 631, 220 A.2d 29 (1966). Plaintiff asserts that Campbell "specifically represented that he could and would provide defendant with the bond it needed, that satisfied all ConnDOT's requirements." (Dkt. # 53, at 16–17). Current Defelice President William McGee testified that Campbell agreed to provide Defelice with a bond for Yellow Mill 1. (McGee Dep. at 65). Indeed, Campbell confirmed that in his dealings with Defelice over the years, he intended to induce the company's reliance for ConnDOT bid bonds. (First Campbell Dep. at 38, 109–11). Still, based on Campbell's oral representations alone, it is unclear whether he expressed a willingness to enter into a contractual arrangement with Defelice. Therefore, there is a genuine issue of material fact whether a contract was established by specific representations made by either party.[12]

which a promisor could reasonably have expected to induce reliance." *D'Ulisse–Cupo v. Board of Dirs. of Notre Dame High School,* 202 Conn. 206, 213, 520 A.2d 217 (1987) (quoting *Kimberly–Clark Corp. v. Dubno,* 204 Conn. 137, 148, 527 A.2d 679 (1987)). Campbell agreed that he made an effort to keep Defelice's business and make the company rely on his bonding expertise; he also agreed that he knew that t relied on him to get it bonds. (First Campbell Dep. at 38, 109–11). However, it is not clear whether Campbell made specific statements to that effect with regards to which party would be responsible for assuring that the bonds he issued were valid. Plaintiff might well be advised to amend its complaint to more clearly set out its estoppel claim.

12. Defendants claim that even if Campbell said that the bonds he issued to Defelice would meet state requirements, this statement should not be interpreted as the basis of an oral contract because it was a personal guarantee, which defendants claim cannot be read into an oral contract. (Dkt. # 45, at 8).

### b. Implied Contract

 In the alternative, plaintiff claims that the parties' conduct, their course of dealing, and the custom of the surety industry indicate that there was an implied contract between Defelice and defendants. (Dkt. # 47, at 11; Dkt. # 59, at 4). Defendants argue that none of these factors are sufficient to establish the existence of such a commitment. (Dkt. # 45, at 8; Dkt. # 56, at 1; Dkt. # 58, at 1–2).

"A contract implied in fact, like an express contract, depends on actual agreement."

*D'Ulisse–Cupo,* 202 Conn. at 211 n. 2, 520 A.2d 217. This type of contract is not expressed in words but is inferred from the acts and conduct of the parties. *Brighenti v. New Britain Shirt Corp.,* 167 Conn. 403, 406, 356 A.2d 181 (1974) ("The test is whether the conduct and actions of the parties show an agreement."). The existence of an implied agreement, like any other contract, is an obligation created by law that imposes a duty to perform. *Therrien v. Safeguard Mfg. Co.,* 180 Conn. 91, 94–5, 429 A.2d 808 (1980). An implied contract can exist even when there are no express manifestations of mutual assent if the parties by their conduct recognized the existence of their contractual obligations. *Rahmati v. Mehri,* 188 Conn. 583, 587 & n. 4, 452 A.2d 638 (1982).

The parties' actions seem to suggest that Yellow Mill 1 was a transaction which took place in the context of a long-term relationship in which Campbell supplied valid bid bonds for the contractor.[13] For over twenty-five years, Defelice repeatedly requested bid bonds from Campbell, who in turn provided most, though not all, of those bonds. (First Campbell Dep. at 37). Both parties have indicated that each fostered this type of long-term relationship, (Hallberg Dep. at 35; First Campbell Dep. at 109), and Campbell admitted that he was working under the assumption that he was to provide most of Defelice's bid bonds. (First Campbell Dep. at 36–37). However, McGee's characterization of his discussion with Campbell regarding the Yellow Mill 1 project suggests that the parties' conduct was not as clearly indicative of an implied contract as plaintiff claims. He explained, "It wasn't 'Yes I'll give you the bond; no, I won't give you the bond.' It was a long, drawn-out process." (McGee Dep. at 64). When the evidence with regards to the parties' conduct is viewed alternately in a light most favorable to either party, a genuine issue of

---

While they cite *Bria* for this proposition, they misconstrue the rule in that case. The *Bria* court found that a doctor could not have personally guaranteed that no unexpected or unusual consequences would result from medical treatment because a promise not expressly made will not be read into a contract unless it arises by necessary implication from the terms of the agreement. *Bria,* at 631, 220 A.2d 29 (*citing Ives v. City of Willimantic,* 121 Conn. 408, 411, 185 A. 427 (1936)). It appears that a similar conclusion cannot be drawn in this case, given that McGee stated that he and Campbell never discussed whether the Yellow Mill 1 bond would meet Connecticut standards because he simply assumed, this was "a given." (McGee Dep. at 65).

**13.** Plaintiffs cite *L.F. Pace & Sons, Inc. v. Travelers Indem. Co.,* 9 Conn.App. 30, 35–36, 514 A.2d 766 (1986), *cert. denied,* 201 Conn. 811, 516 A.2d 886 (1986), for the proposition that an implied contract arises between a surety and contractor based on their course of dealing. (Dkt. # 47, at 14; Dkt. # 53, at 20; Dkt. # 59, at 2). That case, however, is distinguishable from the present case because it involved a surety who refused to issue performance and payment bonds for a contractor after it had already issued it a bid bond. *Id.,* at 33, 514 A.2d 766. The implied contract pertained to these other types of bonds, while here, the contract involves only bid bonds. In fact, course of dealing is typically used not to establish a contract's existence, but to aid interpretation of particular issues where parties may have encountered similar issues before. *Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 761 F.Supp. 1010, 1021 (S.D.N.Y. 1991), *aff'd* 961 F.2d 1052,1057 (2d Cir. 1992); *Anchor Fish Corp. v. Torry Harris, Inc.,* 135 F.3d 856, 860 (2d Cir.1998). Thus, the parties' prior course of dealing may assist the Court in determining the specific terms of the alleged contract, see section B *infra,* but should not be used as evidence of the contract's formation.

material fact exists as to whether a contract arose from their actions.

Like conduct, custom and usage can be used to show that an implied contract exists; this evidence is properly admitted when the subject of the agreement is not a matter of common knowledge. *Jacobson Elec. Co. v. Rome Fastener Corp.*, 156 Conn. 55, 60, 238 A.2d 415 (1968); *L.F. Pace*, 9 Conn.App. at 38, 514 A.2d 766. Evidence of a particular industry's custom is properly attributed to parties to a contract who are engaged in that trade. *Olesen v. Beckanstin*, 93 Conn. 614, 618–19, 107 A. 514 (1919). Given that both plaintiff and defendants have been involved with the construction and surety businesses for at least twenty-five years, it should be presumed that both parties knew the custom of the industry at the time of the Yellow Mill I bid. However, while each has produced evidence regarding the duty of the surety agent when issuing bid bonds to contractors, neither has shown whether it is customary within the surety industry to regard an extended relationship between such parties as a contractual commitment. The custom of the industry in this respect is a genuine issue of material fact.[14]

### 2. Terms

Plaintiff contends that under the alleged contract, Campbell was responsible for assuring that the bid bonds he issued to Defelice met ConnDOT standards; they claim that by failing to perform this duty, he breached the agreement. (Dkt. # 8, at 16–18). Defendants argue that while it may have been Campbell's responsibility to obtain bid bonds, it was not his duty to make sure that they were in compliance with state regulations. (Dkt. # 56, at 8–9; Dkt. # 58, at 3).[15]

Even if it can be shown that the parties had arrived at some sort of mutual understanding that Campbell would provide some or all of Defelice's bid bonds, the terms of such an agreement are too uncertain to grant either party's motion for summary judgment. First, there are genuine issues of material fact as to the requirements of a valid bid bond when the contractors were bidding for the Yellow Mill 1 project and as to whether Defelice's bid bond complied with those regulations. ConnDOT Commissioner Sebastian Cianci testified that the new standards applied to the Yellow Mill 1 project because the March 13, 1996 letter merely articulated a policy that had been in place for at least a year. (Cianci Dep. at 134–35). However, the DOT's decision to rebid the project suggests that the Department was not prepared to enforce its policy.[16] There is also a question of whether CCC and CNA functioned as co-sureties for Fireman's and

---

14. In fact, plaintiff uses evidence of conduct and course of dealing to support its contention that custom and usage establish the existence of a contract. (Dkt. # 47, at 16; Dkt. # 59, at 9).

15. In the alternative, defendants claim that the terms of the alleged contract were so indefinite as to render it unenforceable. (Dkt. # 45, at 8). "Under established principles of contract law, an agreement must be definite and certain as to its terms and requirements." *Dunham v. Dunham*, 204 Conn. 303, 313, 528 A.2d 1123 (1987), *overruled on other grounds* (*citing Augeri v. C.F. Wooding Co.*, 173 Conn. 426, 429–30, 378 A.2d 538 (1977); A. CORBIN, CONTRACTS § 95 (1963); RESTATEMENT (SECOND) OF CONTRACTS § 33). If the essential terms of an agreement are omitted or phrased in too indefinite a manner, the

agreement will be unenforceable. *Brookhaven Hous. Coalition v. Solomon*, 583 F.2d 584, 593 (2d Cir.1978). According to RESTATEMENT (SECOND) OF CONTRACTS § 33, terms are reasonably certain when they provide a basis for determining the existence of a breach and giving the appropriate remedy. In this case, although the terms of the alleged contract are uncertain, see discussion *infra*, when the evidence is construed in the light most favorable to the plaintiffs, there is a possibility that they could be determined.

16. In fact, Ciambro, the construction company that submitted the second-lowest bid for Yellow Mill 1, was also automatically disqualified because it contained a defective bid bond. (Dkt. # 43, Exh. 11; Dkt. # 56, Exh. 26).

thereby increased the latter's T-limit into a range which would have met the new requirements in the Standard Specifications Book. (CNA letters). In short, given that it is unclear whether the Yellow Mill 1 bid bond that Campbell supplied was defective, it is equally uncertain whether defendants breached any alleged contract with Defelice.

The record also does not indicate whether the contract, if it existed, stipulated which party was responsible for ascertaining ConnDOT bid bond requirements and assuring that any given bond complied those regulations. The parties' prior course of dealing suggests that this duty may have lain with plaintiffs. Campbell explained that, "[w]e rely on our contractors to provide us with bond forms or data on bonds that they find in the specifications for the jobs they bid." (First Campbell Dep. at 44). He stated that inquiring of ConnDOT or any other party concerning bid bond requirements would be highly unusual. (First Campbell Dep. at 50–51). However, McGee stated that it was "a given" that any bid bond Defelice received from a surety company would meet ConnDOT requirements. (McGee Dep. at 65). In addition, former Defelice President Victor Hallberg testified that no one at Defelice ever became involved with the details of the bid bond; he said, "[Defelice] told [Campbell] the job we wanted to bid and the date it was going to bid, and asked him for a bond for that job, any documents, he saw to it that he got those documents." (Hallberg Dep. at 27).

The evidence that the parties cite to establish the custom of the industry is similarly contradictory. Defendants deposed several surety agents who indicated that it was the industry's custom for the surety to rely entirely on the contractor to supply information regarding bid bond requirements. (Susanin Dep. at 63; Saul Dep. at 15, 17–20; Sampsel Dep. at 30–31; Orlando Dep. at 13–14, 17–18; McCabe Dep. at 65–67, 78–79). Even McGee admitted that while he did not know whether Defelice was aware of ConnDOT's new policy prior to the Yellow Mill 1 bid's submission, when he receives notice of a change in ConnDOT requirements, he generally passes it on to defendants "as a gesture." (McGee Dep. at 68–69). However, surety agents also testified that they generally make sure that the companies they use to issue bid bonds have T-limits within a range that is acceptable for a particular project. (Sampsel Dep. at 5; Saul Dep. at 40–41; McCabe Dep. at 184–187; Ferrucci Dep. at 25; Romano Dep. at 12–13). In fact, many of the same agents testified to both statements. These contradictions indicate that genuine issues of material facts exist not only as to the parties' course of dealing and custom of the industry, but also as to whether Campbell's alleged failure to issue a valid bid bond contravened either.[17]

In this case, not only are the terms of the contract in dispute, the parties cannot agree as to whether a contract existed in the first place. It is clear that this Court cannot determine now whether a contract was breached. Therefore, the existence of genuine issues of material fact precludes summary judgment for both parties on Count One.

17. Moreover, even if the parties were bound by an implied-contract, and even if the terms of that contract could be clearly understood from their conduct, the particularities of the Yellow Mill 1 bid may have altered the duties of the parties under that agreement. McGee became the new president of the company in 1995, taking over from Hallberg, who headed the company for many years. (Hallberg Dep. at 25). McGee explained to Campbell that he intended to increase the size of the projects on which Defelice would bid. (McGee Dep. at 26). In fact, he testified that Yellow Mill 1 was the first project that would require a bond in excess of $50 million. (McGee Dep. at 64). A more costly project, in turn, would require a larger bid bond issued from a surety company with a larger T-limit. It is unclear whether the change in the type of project with which Defelice was involved altered its alleged contract with Campbell by shifting the responsibility for confirming the validity of Defelice's bid bonds from one party to the other.

### 3. Implied Duties

Defelice also contends that defendants breached a duty of care implied in their contractual relationship by failing to provide it with a valid bid bond for Yellow Mill 1. (Dkt. # 47, at 27; Dkt. # 53, at 18, 20).

■ A duty of care may arise from "a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Burns v. Board of Education*, 228 Conn. 640, 646, 638 A.2d 1 (1994) (citing *Coburn v. Lenox Homes, Inc.*, 186 Conn. 370, 375, 441 A.2d 620 (1982)). Breach of a duty of care can be actionable in tort or in contract. *Ursini v. Goldman*, 118 Conn. 554, 559–560, 173 A. 789 (1934). However, a breach of contract case is much different from a negligence claim: "even though they both ... may arise out of the same transaction ... The two courses of action are dissimilar as to theory, proof and damages recoverable." *Camposano v. Claiborn*, 2 Conn.Cir.Ct. 135, 137, 196 A.2d 129 (1963)(discussing a medical malpractice action). The action in contract must be based "upon a failure to perform a special agreement." *Malone v. Caldwell*, No. 39 14 36, 1992 WL 83794, *2 (Conn.Super.Ct. April 20, 1992); *see also Polesak v. Medical Lab. Servs., Inc.*, No. CV 970339545S, 1997 WL 422532, *2–3 (Conn.Super.Ct. July 17, 1997).[18]

Thus far, plaintiff has not produced any evidence that such a special agreement existed. Therefore, while plaintiff states a claim for breach of duty, it does not belong in Count One.

### B. COUNT TWO

■ In Count Two, plaintiff alleges that Campbell's failure to issue a Yellow Mill 1 bid bond that complied with ConnDOT requirements was an act of negligence that breached the standard of care he owed Defelice as a licensed surety agent. (Dkt.# 8, ¶ 20.) This negligence, plaintiff argues, was the direct, proximate and foreseeable cause of Defelice's having lost both Yellow Mill contracts. (*Id.*, ¶ 24.) Defendant argues that Campbell's actions were not negligent, but if they were found to be negligent, defendants should not be held responsible for three reasons: (1) Defelice was contributorily negligent, (Dkt. # 12, at 5, 6–7; Dkt. # 45 at 10–11; Dkt. # 58, at 5–7), (2) the defective Yellow Mill 1 bid bond was not the proximate cause of plaintiff's losing the rebid, (Dkt. # 45, at 11–14;

18. Plaintiff contends that Campbell's duty of care as a surety agent arises in two ways. First, given that surety bonds are a form of insurance, Defelice argues that Campbell owed a duty similar to that expected of an insurance agent. (Dkt. # 47, at 29–30). It cites several cases that indicate that every insurance broker or agent owes a duty of "reasonable skill, care and diligence in effecting the insurance" and that he or she is liable for any loss attributable to his or her default. *Todd v. Malafronte*, 3 Conn.App. 16, 22, 484 A.2d 463 (1984) (citing *Ursini*, 118 Conn. at 559–560, 173 A. 789). Second, plaintiff relies on *Villano v. Pomeroy* for the proposition that there is implied in every contract for work or services a duty to perform it skillfully, carefully, diligently, and in a workmanlike manner. No. 380018, 1998 WL 47798 (Conn.Super.Ct. February 2, 1998); 4 Conn. Ops. 272, 273 (March 2, 1998). Defelice then applies this rule to the surety industry. (Dkt. # 53, at 19).

Assuming that Campbell was to issue valid bid bonds under the alleged contract between Defelice and defendants and that the Yellow Mill 1 bond was not valid, Defelice argues that Campbell's actions breached a contractual duty of care. (Dkt. # 53, at 20).

While *Todd* and *Ursini* establish the duty of insurance agents and brokers, it does not necessarily follow that a party can sue in contract for the breach of that duty. In fact, as the court in *Ursini* stated, "The principal may sue either for breach of [a] contract or in tort for breach of the duty imposed by it." 118 Conn. at 791, 174 A. 64 (emphasis added). In addition, *Villano* is distinguishable. (Dkt. # 58, at 3–4). In that case, a homeowner found to have no remedy in tort recovered in contract because the exterminator had made an express promise to rid the house of termites. 1998 WL 47798, at *2. In this case, there is no evidence of a comparable guarantee of a specific result.

Dkt. # 58, at 7–9), and (3) Defelice failed to mitigate its damages, (Dkt. # 45, at 14–15; Dkt. # 58, at 8).

To recover damages in negligence, the plaintiff must prove (1) that there was a duty of care, (2) that the defendant breached that duty of care, and (3) that this breach was the proximate cause of the plaintiff's injuries. Coburn, 186 Conn. at 372, 441 A.2d 620; *Maffucci v. Royal Park Ltd. Partnership,* 243 Conn. 552, 566, 707 A.2d 15 (1998). The existence of a duty of care is a question of law and only if one is found to exist does the trier of fact then determine whether defendant violated that duty in a particular situation. *Id.* at 566–67, 707 A.2d 15. (citation omitted). It appears that as a surety agent, Campbell owed Defelice a duty consistent with the practice in the industry, but it is not clear what that standard was. *See* n. 17 *supra.* The duty of care arising from the alleged contract is equally uncertain. Thus, the existence, nature, and breach of a duty are genuine issues of material fact.

Viewing the evidence in the light most favorable to plaintiff, there also exists a genuine issue of material fact as to whether Defelice was contributorily negligent. Although Cianci's deposition suggests that as a Yellow Mill 1 bidder and a member of ConnDOT's subscription list, Defelice probably received the notice outlining the change in policy, (Guyette Dep. at 65), the company cannot produce definitive proof of this fact. (Cianci Dep. at 131). A finding of contributory negligence appears unlikely if Defelice had no way of knowing that the policy had been changed. Second, neither the standard of the industry nor the custom of the parties has been satisfactorily established. Even if Defelice had received the notice, it is not clear whether it

was under a duty to pass it on to the defendants, even though McGee stated that this is what he would have done had he received the notification. (McGee Dep. at 68–69).[19] At this time, there is simply insufficient evidence for this Court to conclude that Defelice was contributorily negligent in its actions concerning the Yellow Mill 1 bid bond.

Defendants also have not met their burden with respect to the proximate cause issue. Proximate cause is an actual cause that is a substantial factor in the resulting harm. *Stewart v. Federated Dept. Stores, Inc.,* 234 Conn. 597, 606, 662 A.2d 753 (1995). The harm which occurred must be of the same general nature as foreseeable risk created by defendant's negligence, and foreseeable risk may include acts of plaintiff and of third parties. *Fleming v. Garnett,* 231 Conn. 77, 86, 646 A.2d 1308. (1994) (*citing Doe v. Manheimer,* 212 Conn. 748, 758, 563 A.2d 699 (1989), *overruled on other grounds* ); *see also Suarez v. Sordo,* 43 Conn.App. 756, 770, 685 A.2d 1144 (1996), *cert. denied,* 240 Conn. 906, 688 A.2d 334 (1997). When this requirement is satisfied, "the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct." *Stewart,* 234 Conn. at 606–08, 662 A.2d 753. While proximate cause has been characterized as essentially a factual issue, it becomes a conclusion of law when the mind of a fair and reasonable person could reach only one conclusion. *Id.* at 611, 662 A.2d 753; *Abrahams v. Young & Rubicam, Inc.,* 240 Conn. 300, 306, 692 A.2d 709 (1997).[20]

**19.** Defendants argue that the fact that both plaintiff and defendants made similar arguments to ConnDOT when trying to convince the agency to accept Defelice's Yellow Mill 1 bid shows that each was responsible for Defelice' loss of the project. (Dkt. # 45, at 10). However, the fact that the two parties made similar arguments is irrelevant—it was clearly in both parties' best interests to award Yellow

Mill 1 to Defelice. This similarity alone does not show contributory negligence, but demonstrates mere mutual interest.

**20.** To support their position, defendants cite a 9th Circuit case, *Exxon Co v. Sofec, Inc.* 54 F.3d 570, 578 (9th Cir.1995), *aff'd,* 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996), to establish that "merely rendering a plaintiff

Defendants assert that Defelice's decision to increase its bid for Yellow Mill 2 was an intervening act resulting in plaintiff's loss of the project such that Campbell's alleged breach of duty could not be the proximate cause of Defelice's injuries. (Dkt. # 45, at 11–14; Dkt. # 58, at 7–9). Indeed, according to defendants' expert, only $565,000 of the $1.8 million price increase between Defelice's bids for two Yellow Mill projects was necessary result of alterations in ConnDOT's specifications for the project. (Schumacher Aff. ¶ 11). This suggests that Defelice lost the project because it increased its estimate solely to assure a higher profit margin. However, plaintiff puts forth a plausible explanation for the remaining increases, arguing that it regarded Yellow Mill 2 as a separate bid that cannot be compared to that for its first bid. (McGee Dep. at 98). Moreover, if Campbell's conduct is held to be negligent, Defelice's loss of the Yellow Mill project is a reasonably foreseeable result of his conduct. Count Two therefore cannot be dismissed on the basis of causation issues.

■ Plaintiff's negligence claim also cannot be dismissed based on a failure to mitigate damages. A party who has been injured by the negligence of another must use reasonable care to promote recovery and prevent any aggravation or increase of the injuries. *Preston v. Keith*, 217 Conn. 12, 15, 584 A.2d 439 (1991). When facts indicate that a plaintiff may have "failed to promote [his or her] recovery and do what a reasonably prudent person would be expected to do under the circumstances, the court, when requested to do so, is obliged to charge on the duty to mitigate damages." *Id.* (*citing Jancura v. Szwed*, 176 Conn. 285, 288, 407 A.2d 961 (1978)). De-

fendants claim that the fact that Defelice increased its Yellow Mill 2 bid by $1.8 million shows it did not mitigate its damages. (Dkt. # 45, at 15). Richard Guyette, Defelice's chief estimator stated that Defelice refigured the job because the company "wanted to be more conservative" and "more safe." (Guyette Dep. at 74, 102, 104, 205–06; Dkt. # 45, at 5). However, in light of the circumstances, Defelice's desire to be "conservative" or "safe" does not necessarily indicate that it failed to mitigate its damages. Given the fact that Defelice's Yellow Mill 1 bid had been made public, it was at a distinct disadvantage in the second round of bidding and its desire to be cautious in the second round seems reasonable. Moreover, the fact that Defelice appeared to make a good-faith attempt to win the second bid suggests that it was in fact trying to *prevent* any damage that it incurred as a result of the loss of the first bid. Again, defendants have not met their burden in showing a failure to mitigate.

### C. COUNT THREE

■ In Count Three, plaintiff claims that Campbell's alleged failure to meet the duty of care owed to Defelice as a surety agent and under the alleged contract violated CUTPA. (Dkt. # 8, ¶¶ 25–26; Dkt. # 53, at 28–9). Defelice also asserts that Campbell misrepresented the fact that he would issue a valid Yellow Mill 1 bid bond; in doing so, it claims he withheld material information, made unsubstantiated advertising claims, and generally acted with "reckless indifference as to whether Defelice got the bid bonds it needed to be successful." (Dkt. # 53, at 25–28). Defendants argue that Campbell's statements at

---

susceptible to harm does not prove that negligence was the cause of the harm." (Dkt. # 58, at 8; Dkt. # 45 at 12). Thus, defendants argue that while their alleged negligence may have caused the Yellow Mill 1 bond to be defective, this did not result in plaintiff's losses, which were actually caused by Defelice's decision to change its bid strategy to increase its profits margin. (Dkt. # 58,

at 7.) Plaintiff distinguishes Exxon as a case involving "extraordinary negligence." (Dkt. # 53, at 34). *Stewart* also indicates that defendants should not be relieved of liability first because there was no third party interference, and second because Defelice's loss of the Yellow Mill project is within the scope of risk created by Campbell's alleged negligence.

most show negligence or breach of contract, neither of which they claim is sufficient to establish a CUTPA claim on its own. (Dkt. # 45, at 9–10).

■ A defendant's actions are unfair and violative of CUTPA when: (1) they offend public policy, (2) they are immoral, unethical, oppressive and unscrupulous, and (3) they cause substantial injury to consumers. *Williams Ford, Inc. v. Hart-ford Courant Co.*, 232 Conn. 559, 591, 657 A.2d 212 (1995); *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038 (2d Cir.1995). Whether a practice satisfies these requirements is an issue of fact. *Tarka v. Filipovic*, 45 Conn.App. 46, 55–56, 694 A.2d 824 (1997). In order for a plaintiff to prevail on a CUTPA claim, defendant's behavior need not satisfy all three criteria and he or she need not possess an intent to deceive. *Jacobs v. Healey Ford–Subaru, Inc.*, 231 Conn. 707, 725–26, 652 A.2d 496 (1995).

■ A CUTPA claim for misrepresentation may include "a broader range of conduct than did the common law action for misrepresentation [and a] CUTPA plaintiff need not prove reliance or that the representation became the basis of the bargain." *Prishwalko v. Bob Thomas Ford, Inc.*, 33 Conn.App. 575, 583, 636 A.2d 1383 (1994) (citation omitted).[21] An innocent misrepresentation is sufficient to state a claim under CUTPA. *Id.*, at 583, 636 A.2d 1383; *see also Web Press Servs. v. New London Motors, Inc.*, 203 Conn. 342, 363, 525 A.2d 57 (1987)("Constructive or actual knowledge of a falsity is not an element.").[22] However, the Connecticut Supreme Court has recently ruled that "commercial losses arising out of the defective performance of contracts for the sale of goods cannot be combined with negligent misrepresentation" for the purposes of a CUTPA claim. *Flagg Energy Dev. Corp. v. General Motors Corp.*, 244 Conn. 126, 153–54, 709 A.2d 1075 (1998).

■ When the plaintiff is given the benefit of all reasonable inferences, it is possible that Defelice might prevail on Count Three based on breach of duty and misrepresentation. As stated in section one *supra*, Defelice alleges that Campbell's duty of care is derived from the alleged contract and from the standard of the surety industry. Thus, even if the *Flagg Energy Development* decision can be applied to the services context, plaintiff's claim of breach of duty can survive with its claim of essentially negligent misrepresentation because Campbell's alleged duty of care arises from a source other than the contract itself.[23] The allegation of misrepresentation is sufficient to state a claim under CUTPA because neither intent to

---

**21.** In general, a party alleging misrepresentation must show:
(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury.
*Maturo v. Gerard*, 196 Conn. 584, 587, 494 A.2d 1199 (1985) (citations omitted).

**22.** Defendants assert that they "have made no representation (misleading, innocent or otherwise) that could violate CUTPA," and claim that plaintiff's assertion that Campbell would obtain all the information the defendants needed to determine ConnDOT's bid bond requirements is false. (Dkt. # 58, at 4). They also argue that plaintiff's use of *Prishwalko* is incorrect because it involved misrepresentations of mileage, a practice against which

there is a particularly strong public policy in Connecticut. (Dkt. # 58, at 5).

**23.** Defendants argue that plaintiff's allegation of breach of duty amounts to a negligence claim that is insufficient under CUTPA. (Dkt. # 45, at 9–10). Connecticut case law admittedly is unclear as to whether negligence is sufficient to constitute a CUTPA violation on its own. See *Haynes v. Yale–New Haven Hosp.*, 243 Conn. 17, 34, 699 A.2d 964 (1997)("we do not decide whether negligence alone is sufficient to support a CUTPA claim"); *see also Williams Ford*, at 590 & n. 25, 657 A.2d 212 (the court declined to decide whether negligence of the defendant alone, unaccompanied by contributory negligence of plaintiff, will establish a CUTPA violation). In this case, the Court may never have to reach this question if the trier of fact finds Campbell made misrepresentations as well.

deceive nor knowledge of the falsity is a necessary element of CUTPA claims. Thus, although Campbell has testified that he expended his "best efforts" in providing bid bonds for Defelice, it is possible that his statements regarding his ability to provide bid bonds for Defelice (First Campbell Dep. at 38), though perhaps innocent, could be found to constitute a false representation actionable under CUTPA. Therefore, there is a genuine issue of material fact whether Campbell made any misrepresentations that were contrary to public policy or immoral, unethical, oppressive and unscrupulous.

Plaintiff also argues that it is entitled to punitive damages based on defendants' alleged misrepresentations. (Dkt. # 53, at 29–30). The court has ultimate discretion as to whether to award punitive damages under CUTPA. CONN. GEN. STAT. § 42–110g(a); *Gargano v. Heyman,* 203 Conn. 616, 622, 525 A.2d 1343 (1987). However, to recover such damages, a party must show that another was recklessly indifferent, intentional and wanton, malicious, violent, or motivated by evil. *Gargano,* 203 Conn. at 622, 525 A.2d 1343; *see also Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1040 (2d Cir.1992). While it appears doubtful that Campbell's behavior rises to this level, it is possible to interpret it as such when the evidence is viewed in the light most favorable to plaintiff. Therefore, plaintiff's entitlement to punitive damages is a genuine issue for trial.

### III. Conclusion

In conclusion, defendants' motion for summary judgment (Dkt.# 43) is denied and plaintiff's cross-motion for partial summary judgment (Dkt.# 46) is denied.